Arlene VIOLET, In Her Capacity As Attorney General of the State of Rhode Island, Plaintiff,

v.

Warren V. PICILLO, Sr., et al., Defendants.

Civ. A. No. 83–0787 P.

United States District Court, D. Rhode Island.

Aug. 1, 1985.

Susan B. Squires, Office of Atty. Gen. of R.I., Providence, R.I., for plaintiff.

Leif Sigmond, pro se.

James H. Russell, Baker & Hostetler, Orlando, Fla., Richard Boren, Howard Lipsey, Providence, R.I., for Thiokil Corp.

Christopher Little, Providence, R.I., for Nat'l Starch Corp.

C. Russell Bengtson, Richard T. Linn, co-counsel, Providence, R.I., William G. Ballaine, Siff & Newman, New York City, for United Sanitation, Inc., Daniel Capuano, A. Capuano Bros., Inc., Jack Capuano, Sanitary Landfill, Inc. and Anthony Capuano.

A. Lauriston Parks, James T. Murphy, Providence, R.I., for Advanced Environmental Technology Corp.

Barbara S. Cohen, Anthony Muri, Providence, R.I., for Monsanto Co.

Gregory L. Benik, Providence, R.I., for Olin Corp.

Dominick Presto, Presto & Barbire, Rutherford, N.J., for Scientific Control Processing & Scientific Environmental Control Systems.

John F. Bomster, David J. Oliveira, Providence, R.I., for Hydron Lab.

Deming S. Sherman, Providence, R.I., for Exxon Research & Engineering Co., Rohm & Haas Co. and American Cyanamid Co.

Harriet Sims Harvey, Englewood, N.J., for Mack Barnes.

Alden C. Harrington, Providence, R.I., for Warren Picillo, Sr.

Harold E. Krause, Providence, R.I., for Michael Musillo.

Harold Hestnes, Hale & Dorr, Boston, Mass., Benjamin B. White, III, Providence, R.I., for GAF.

John F. Dolan, Rice Dolan & Kershaw, Providence, R.I., for Rutgers University.

James Russell, Cleveland, Ohio, John Cuzzone, Jr., Providence, R.I., for Morton-Thiokol, Inc.

## OPINION AND ORDER

PETTINE, Senior Judge.

This is an action brought by the Attorney General of the State of Rhode Island to recover costs incurred by the state in cleaning up large quantities of toxic waste alleged to have been illegally dumped at the Picillo pig farm in Coventry, Rhode Island, as well as to collect damages for the impairment of the state's natural resources alleged to have been caused by this waste disposal. The state seeks relief pursuant to the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq.*, and the Clean Water Act ("CWA"), 33 U.S.C. § 1251, *et seq.* Named as defendants in this action are some thirty parties, including the owner-operators of the site; parties alleged to have transported, or arranged for the transport of, waste to the site; and parties alleged to have "generated" (that is, produced) waste found there.

Currently before the Court are the motions of four "generator" defendants for dismissal, pursuant to Fed.R.Civ.P. 12(b)(2), for lack of *in personam* jurisdiction. Defendants Advanced Environmental Technology Corporation ("AETC"), Exxon Research & Engineering Company ("ER & E"), Rutgers University ("Rutgers") and Hydron Laboratories ("Hydron") each disavow any knowledge of how waste allegedly generated by them came to be disposed at the Picillo site and each claim to lack any significant links to the state of Rhode Island independent of this litigation. They therefore argue that they are not amenable to the jurisdiction of this Court. For its part, the state argues that jurisdiction is proper for two reasons. First, the state urges that, in enacting CERCLA, Congress authorized nationwide service process for those sued under the statute's terms, and thereby obviated the need to employ the traditional test of local contacts. Alternatively, the state contends that the traditional test of contacts, even if applicable to actions brought under CERCLA, may be satisfied in this case.

On February 12, 1985, the Magistrate, to whom I had referred for recommendation to the Court the dismissal motion of defendant Rutgers, rejected the state's two asserted bases for jurisdiction and recommended that Rutgers' motion be granted. That recommendation has been objected to by the state and is here for my review.[1]

---

1. I have reviewed defendant Rutgers' argument that plaintiff's objections to the Magistrate's rec-

Accordingly, I must now decide the two questions raised by all four defendants: whether CERCLA authorizes nationwide service of process upon them and, if it does not, whether each defendant may, consistent with the strictures of the due process clause, be made to defend this litigation in this forum.

## I. FACTUAL BACKGROUND

In 1977, state environmental authorities learned that a hazardous waste disposal site was maintained at the Picillo pig farm. As a result of a dramatic explosion there in September of that year, the state discovered what one judge, in related litigation conducted in the courts of Rhode Island, has called a "chemical nightmare." *Wood v. Picillo,* 443 A.2d 1244, 1246 (R.I.1982) ("*Picillo I* "). In *Picillo I,* the Rhode Island Supreme Court affirmed a finding that the owner-operators of the site had created a public and private nuisance under state law. That state court action also named AETC, Rutgers, E, R & E, and Hydron as defendants and is still pending as to the latter three.[2] The state Supreme Court's decision in *Picillo I* may be consulted for further general background on the site. Principally relevant for purposes of the present motion are the jurisdictional facts as to each defendant.

The record from which these jurisdictional facts must be gleaned consists of the Complaint, affidavits filed by defendants Rutgers and E, R & E, and materials, including interrogatory answers, from the record of the ongoing state litigation which have been submitted to this Court by defendant AETC and by the state. Viewing these materials in the light most favorable to the plaintiff, *see, e.g., Amoco Oil v. Local 99, Intern. Broth. of Elec., Etc.* 536 F.Supp. 1203, 1209–10 (D.R.I.1982), whose burden it is to make at least a *prima facie* showing of jurisdiction, *see, e.g., North American Video Corp. v. Leon,* 480 F.Supp. 213, 216 (D.Mass.1979); *Nel-*

*son by Carson v. Park Industries, Inc.,* 717 F.2d 1120, 1123 (7th Cir.1983), *cert. den.,* —— U.S. ——, 104 S.Ct. 1277, 79 L.Ed.2d 682 (1984); *United States v. Montreal Trust Co.,* 358 F.2d 239 (2d Cir.), *cert. den.* 384 U.S. 919, 86 S.Ct. 1366, 16 L.Ed.2d 440 (1966), I find, for purposes of deciding this motion, the following facts.

### A. Defendant AETC

Defendant AETC is a New Jersey corporation, with its principal place of business in New Jersey. AETC is in the business of "brokering," for disposal, chemical waste products generated by its clients. AETC's brokering services include packaging waste products, and arranging for the transport, and ultimate disposal of, such products. During the years 1976–1978, most of the waste brokered by AETC was apparently disposed of at two principal sites: the Chemical Control Corporation of Elizabeth, New Jersey and the NEWCO (now "CECOS") Disposal Site in Niagara Falls, New York. The record does not disclose whether these were the only sites to which AETC sent its clients' waste products for disposal. Beginning in 1977, a majority of AETC's waste went to the New York site, to which AETC began shipping waste in late 1976 or early 1977.

In 1976, AETC began handling chemical waste disposal for defendant Rutgers and defendant E, R & E. In approximately the fall of 1981, AETC was contacted by state environmental authorities regarding some of the waste materials found at the Picillo site. AETC was apparently contacted after numerous firms whose wastes were found at the site stated that AETC's brokering services had been used. AETC employees subsequently travelled to the site to confer with state officials about the materials in question.

AETC has taken the position that it is without knowledge as to how waste han-

---

ommendation were untimely filed and did not satisfy the requirements of particularity set forth in Local Rule 32(c)(2), and I find defendant's claims to be without merit.

**2.** Defendant AETC was dismissed by the Rhode Island Superior Court for want of *in personam* jurisdiction. The effect to be properly accorded that determination by the state court in this federal action is discussed later in this opinion.

dled by it for E, R & E and Rutgers came to be disposed of at the Picillo site, and that it is aware of no other occasions on which its waste has been sent there. AETC's interrogatory answers, however, make no representation as to where, in fact, AETC believes that wastes generated by E, R & E and Rutgers were sent during the relevant time period. Nor does AETC appear to have any documentation regarding the ultimate disposition of E, R & E's or Rutgers' waste products. The record thus indicates that while AETC does not know how wastes handled by it for these parties arrived in Rhode Island, it does not purport to know exactly where these wastes were, in fact, sent.[3]

AETC maintains no office, telephone or bank account in Rhode Island, nor has it any employees or agents in the state. It solicits no business here, although in 1981 it acted as a subcontractor for a Connecticut corporation in connection with the packaging of laboratory chemicals for a Providence, Rhode Island firm. Other than that link, and any link to this state furnished by the subject litigation, AETC apparently has and had no other affiliation with Rhode Island.

## B. Defendant E, R & E

Defendant E, R & E is a Delaware corporation with its principal place of business in New Jersey, and is a wholly owned subsidiary of the Exxon Corporation.[4] E, R & E is engaged primarily in research and engineering activities relating to various aspects of petroleum production and refining.

In October of 1981, E, R & E personnel were contacted by a state environmental official regarding E, R & E laboratory wastes found at the Picillo site. E, R & E takes the position that it lacks direct knowledge as to how any of its waste products may have arrived at the site. During the relevant time period, E, R & E used the services of AETC, whom it denominates an "independent contractor," to dispose of its wastes. In connection with E, R & E's waste, AETC's role was to pack containers of waste in absorbent packaging, and to remove the packaged waste by truck from E, R & E's Linden, New Jersey facility. E, R & E makes no representation whatsoever as to where it believed its waste was destined for disposal, nor does it claim to have any documentation as to where, and by whom, its waste products were, in fact, ultimately taken for disposal.

E, R & E conducts no engineering activities in this state, nor has it any property, employees or sales here. Independent of this litigation, its only contacts with Rhode Island apparently arise from research and consulting agreements it has with a num-

---

**3.** The record indicates that the bulk of AETC's arrangements for disposal of its clients' wastes during the relevant time period were oral, rather than written. AETC's interrogatory answers do indicate, however, that it has certain documents in its possession regarding arrangements it made during this time period with Chemical Control Corp. ("CCC"), and that pursuant to its arrangements with CCC, it would typically receive a "certificate of disposal" for wastes it placed for disposal with CCC. Notably, however, in its answers regarding wastes it handled for clients E, R & E and Rutgers in particular, AETC makes no mention at all of the existence of any documentary records, nor does it profess any knowledge to where these parties' wastes were sent or taken for disposal.

AETC does state cryptically in its answer numbered 22 that "[w]ith regard to our clients, we obtained prior approval from them of the disposal waste." This ambiguous statement is nowhere explained or embellished upon, nor are facts or documentary records mentioned in sup-

port of it, and it is wholly unclear to the Court whether AETC means to suggest that its clients generally approved of the mode, the method, the timing, the location, or of some other dimension of the disposal process. And no other materials in the record refer to, suggest, or explain any such prior approval. This only relevant facts in this record are that Rutgers required proof that AETC, and its sometime-consignee CCC, were *licensed* to conduct waste disposal activities in New Jersey—a fact which, as discussed in note 15, *infra,* standing alone, discloses very little, if anything, about the particular arrangements between Rutgers and AETC regarding Rutgers' wastes.

AETC's single statement regarding prior client approval is both ambiguous and otherwise unsupported in this record and the Court can accord it little weight in deciding this motion.

**4.** There is no claim here that E, R & E may be subjected to the jurisdiction of this Court based on any contacts its parent corporation may enjoy with Rhode Island.

ber of professors and local universities, under which E, R & E is given technical guidance in exchange for its financial support of such institutions as Brown University and the University of Rhode Island.

### C. Defendant Rutgers University

Defendant Rutgers is a state university incorporated in New Jersey. During the years 1976–1977, Rutgers' various chemical laboratories utilized the services of AETC for the disposal of their chemical wastes. AETC won the Rutgers contract through a state-mandated competitive bidding procedure. Daniel B. Howell, a university official responsible for the disposal of waste materials from Rutgers' facilities, believes that in the years 1976–1977, all of Rutgers' hazardous chemical waste materials were transferred to AETC for disposal.

In October, 1981, Howell was contacted by John Leo, a Rhode Island environmental official. Leo reported that a lab pack alleged to belong to Rutgers, dated either 1976 or 1977 and containing a substance known as grignard reagent, was found at the Picillo site. Howell subsequently investigated the university's disposal practices during that time period. He concluded that AETC had handled all of its waste products during those years. He further determined that Rutgers had required, as a condition to its disposal contract, that AETC provide it with proof of proper licensing to conduct waste disposal activity in New Jersey, and that such proof had been provided. He determined as well that AETC had informed Rutgers that some of its waste products "might" be consigned to Chemical Control Corporation of New Jersey, and that proof of this latter corporation's authority to conduct disposal activities in New Jersey had also been supplied. AETC did not indicate to Rutgers that either it, or CCC, would dispose of its waste in Rhode Island—but there is no claim that it indi-

cated that Rutgers' waste would be disposed in New Jersey either, or in any other specified state. Rutgers apparently has no documentation as to where, and by whom, its waste products were ultimately taken for disposal.

Rutgers owns no property in Rhode Island, nor does it seek to procure supplies, equipment or services in this state. Independent of the matters at issue in this litigation, its only contacts with Rhode Island appear to arise from its occasional recruiting of high school students. This recruiting is conducted through a national student service that supplies Rutgers with names of top students, some of whom reside in Rhode Island. After receiving the names, Rutgers sends those students application materials and information. In 1982–1983, 43 of the approximately 47,387 students attending Rutgers haled from Rhode Island.

### D. Defendant Hydron

The record regarding defendant Hydron is scant. It has filed no affidavits in connection with this motion.[5] The materials before me indicate that Hydron is a Delaware corporation with its principal place of business in New Jersey. It is engaged in the manufacture and processing of chemical substances.

Seventeen drums of sodium aluminum hydride, or "vitride," waste generated by Hydron were discovered at the Picillo site. In 1977, Hydron had apparently arranged for the disposal of 28 drums of this vitride substance with Chemical Waste Removal, Inc. ("CWR"), a Connecticut corporation whose principal place of business is undisclosed in the record before me. CWR removed these drums from Hydron's premises.

Hydron asserts that it is without knowledge as to how its waste arrived at the

---

**5.** In addition to the allegations of the Complaint in this action, I have before me, regarding Hydron, portions of the complaint in the state court action, and several answers by Hydron to interrogatories propounded to it by the state in that state court action. In its memorandum to the Court on the present jurisdictional motion, the state expressly incorporated these materials into the record in this action. Hydron has not objected, nor has it submitted materials which in any way controvert or supplement those referred to by the state, and these matters therefore constitute the entire record regarding Hydron for purposes of this motion.

Picillo site. The record indicates that a Hydron official recalls that CWR had a Connecticut permit to dispose of waste, and a Connecticut dump site for chemicals. The record also indicates, however, that Hydron did not know where its waste would be taken for disposal at the time of its removal. Nor is there indication that Hydron has in its possession any documentation as to where, and by whom, its waste was, in fact, ultimately taken for disposal.

The state makes no allegation as to links between Hydron and this state other than those furnished by the matters at issue here, nor does the record currently before me suggest any such links.

## II. DISCUSSION

### A. CERCLA and In Personam Jurisdiction

■ Rule 4(f) of the Federal Rules of Civil Procedure provides in pertinent part that:

All process other than a subpoena may be served anywhere within the territorial limits of the state in which the district court is held, and, when authorized by a statute of the United States or by these rules, beyond the territorial limits of that state.

Under the framework created by the Rules, the jurisdictional reach of a federal district court is coextensive with that of the courts of the state in which it sits, unless a specific federal statute, or separate rule, permits nationwide service of process. *See generally Johnson Creative Arts v. Wool Masters*, 743 F.2d 947, 950 (1st Cir.1984); 4 Wright & Miller, *Federal Practice and Procedure* § 1125 (1969 & 1984 supp.).[6] No separate Rule applies here. The inquiry, thus, is whether CERCLA is such an authorizing statute.

■ The state offers two theories in support of its claim that CERCLA authorizes

federal process to run throughout the nation. It argues first that CERCLA's express terms supply the required authority, and alternatively that implying such a provision is necessary to efectuate the statutory purposes.

Turning first to the state's textual argument, I find that CERCLA is altogether silent as to personal jurisdiction and service of process, and find that the language of the statute will not bear plaintiff's contrary interpretation. Section 9613(b), subtitled "Jurisdiction; venue," provides:

Except as provided in subsection (a) of this section, the United States district courts shall have exclusive original jurisdiction over all controversies arising under this chapter, without regard to the citizenship of the parties or the amount in controversy. Venue shall lie in any district in which the release or damages occurred, or in which the defendant resides, may be found, or has his principal office. For the purposes of this section, the Fund shall reside in the District of Columbia.

42 U.S.C. § 9613(b). In urging that this section authorizes national service of process, the state appears to confuse subject matter jurisdiction with personal jurisdiction. The language conferring exclusive original jurisdiction in the federal district courts "without regard to the citizenship of the parties or the amount in controversy" —language seized upon by the state—is relevant to *subject matter jurisdiction* in actions brought under the statute. Consistent with the language of Article III of the Constitution, and established canons of federal jurisdiction, the effect of this sentence is simply to place actions brought under CERCLA within the federal courts' federal question, and not diversity, jurisdiction. It strikes the Court as too clear to require further articulation that this lan-

---

**6.** It has been long settled that the Constitution permits Congress to authorize that the process of the federal courts run throughout the nation. *See, e.g., Robertson v. Railroad Labor Board,* 268 U.S. 619, 622, 45 S.Ct. 621, 622, 69 L.Ed. 1119 (1925); *Johnson Creative Arts v. Wool Masters,* 743 F.2d 947, 950 (1st Cir.1984) (collecting

cases) (explaining that constitutional limits on ability of state courts to issue extraterritorial process are rooted in the limited sovereignty of the states and that the "United States does not lose sovereignty when a state's border is crossed").

guage does not purport to govern questions of personal jurisdiction.

And, while the presence of language in § 9613 regarding venue demonstrates that Congress saw fit to fashion special venue rules for CERCLA actions, the absence of any parallel language regarding nationwide service of process suggests to the Court that Congress provided no special rule for personal jurisdiction. This is especially apparent in the face of the fact that the numerous other federal statutes authorizing nationwide service of process typically contain clear and express language extending the jurisdictional reach of the federal courts. *See, e.g.,* 15 U.S.C. § 5 (actions by United States under Sherman Antitrust Act); 15 U.S.C. § 25 (actions by United States under Clayton Act); 15 U.S.C. § 77v(a) (actions under Securities Act of 1933); 15 U.S.C. § 78a (actions under Securities Exchange Act of 1934); 28 U.S.C. §§ 1335, 1397, 2361 (actions under federal interpleader act).

█ It is true that express statutory language is not an absolute *sine qua non* for finding nationwide service of process, for courts have occasionally implied such authority in the absence of clear language. *See, e.g., United States v. Congress Construction Co.,* 222 U.S. 199, 32 S.Ct. 44, 56 L.Ed. 163 (1911); *F.T.C. v. Browning,* 435 F.2d 96 (D.C.Cir.1970). In these cases, however, and others that followed their teachings, the federal statutes involved laid venue in only one district, such that a failure to imply authority for extraterritorial process would deprive *any* federal court of the power to adjudicate cases under the statute, absent the fortuitous circumstance that a defendant enjoyed the necessary minimum contacts with the sole district in which venue was proper. No similar problem is posed here, for CERCLA lays venue "in any district in which the release or

damages occurred, or in which the defendant resides, may be found, or has his principal office," 42 U.S.C. § 9613(b). The state has not cited, and the Court has not discovered, any case in which nationwide service of process was implied where venue was not laid exclusively in one district. Nor has the state cited, or the Court discovered, any direct reference in the Act's legislative history to personal jurisdiction in CERCLA actions, or to congressional contemplation of a special rule of national jurisdiction.

Nonetheless, plaintiff's belief that a nationwide service of process provision must be implied in CERCLA to further the statute's aims is not without strong appeal. Without analyzing the statutory scheme with any precision, it is clear that CERCLA's principal purpose is "to initiate and establish a comprehensive response and financing mechanism to abate and control the vast problems associated with abandoned and inactive hazardous waste sites." H.R.Rep. No. 96–1016, Part I, 96th Cong., 2d Sess., at 21 (*reprinted in* 1980 U.S.Code Cong. & Ad.News 6119, 6125, (hereafter " 1980 U.S.C.C. & A.N. ") In service of its goal, Congress created, by last minute compromise in the waning hours of the 96th Congress, a "Superfund," to be jointly financed by industry and the federal government, to provide a ready source of financing for prompt clean-up of waste sites, 42 U.S.C. §§ 9631, 9632, 9641; *see* 1980 U.S. C.C. & A.N., *supra,* at 6134–6135. Congress also created, *inter alia,* a federal cause of action in strict liability,[7] through which owner-operators of hazardous waste sites, as well as disposal and transport arrangers, and generators of waste, 42 U.S.C. § 9607(a)(1)–(4), are made liable, subject only to limited statutory defenses, *id.* at § 9706(b)(1)–(4), for removal, remedial and response costs, *id.* at § 9607(a)(4)(A)–(B), and for certain speci-

---

7. The legislative history of CERCLA reveals that an explicit provision for strict liability was excised in a congressional compromise prior to the Act's final passage. Nonetheless, the Act, as passed, preserved strict liability by providing, in § 9601(32), that "the standard of liability" governing cases brought under the Clean Water Act, 33 U.S.C. § 1321, shall likewise govern CERCLA

actions. The Clean Water Act has been held to impose strict liability, *see Steuart Transportation Co. v. Allied Towing Corp.,* 596 F.2d 609, 613 (4th Cir.1979). *See generally State of New York v. Shore Realty Corp.,* 759 F.2d 1032, 1042 (2d Cir.1985) (reviewing text and legislative history of CERCLA, and concluding that a strict liability standard was intended).

fied environmental damages, *id.* at § 9607(a)(4)(C), when "there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance," *id.* at § 9607(a)(4).

Placing CERCLA in the context of its purposes, it is anomalous, indeed, to conclude that Congress meant to allow CERCLA defendants to interpose personal jurisdiction defenses. This is so for at least three reasons.

First, allowing CERCLA defendants to invoke the traditional minimum contacts doctrine, which looks largely to the extent to which a nonresident has chosen to affiliate itself with a particular forum, *see, e.g., Worldwide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980), or at least with the stream of interstate commerce, *id.* at 297–98, 100 S.Ct. at 567, is at odds with the substantive liability provisions of the Act. Under the latter provisions, liability may generally attach to a defendant who has itself taken no deliberate action with respect to a particular site, but whose activities contributed to the release of hazardous substances at that site. The purpose of this "very stringent standard of liability," *U.S. v. Price,* 577 F.Supp. 1103, 1114 (D.N.J.1983), is to further Congress' stated goals of "cost-spreading and assurance that responsible parties bear the cost of their clean up," *id.* at 1114; *see* 1980 U.S.C.C. & A.N. at 6119–6120; 126 Cong.Rec. S15,003 (daily ed. Nov. 24, 1980) (remarks of Sen. Chafee).

Bringing waste generators within the ambit of the Act's liability provisions was, as a practical matter, an especially important part of CERCLA's objective of appropriate cost allocation. The legislative history of CERCLA indicates that the Environ-

mental Protection Agency estimated in 1980 that perhaps only ten percent of the 77.1 billion pounds of waste annually generated are disposed of in an environmentally sound manner. 1980 U.S.C.C. & A.N. at 6124. Calling waste generators to account for the consequences flowing from the disposal of their toxic waste products, generally without regard to whether they were themselves directly at fault in disposing of their wastes, represents a congressional decision to look for compensation to those economic actors who have participated in, and benefited from,[8] an industry historically pervaded by irresponsible practices at various levels in the chain of disposal. *See, e.g.,* 1980 U.S.C.C. & A.N. at 6120 (discussing "massive problem" of "tragic consequences of improperly, negligently, and recklessly [sic] hazardous waste disposal practices"); *id.* at 6121 (Congressional finding that "[u]nsafe design and disposal methods are widespread"); *id.* at 6128 (Congressional finding that "improper hazardous waste disposal has occurred throughout the country [and] the locations of many hazardous waste sites are unknown"); 126 Cong.Rec. S14,963 (daily ed. of Nov. 24, 1980) (remarks of Sen. Randolph) (discussing history of disposal practices and fact that numerous generators used haulers "to take wastes to unknown locations").

Significant among the pervasive industrial practices recognized by Congress is the problem of dumping wastes at improper, illegal or inappropriate sites, and the associated problem of "midnight," or clandestine dumping of chemical wastes at abandoned, remote or hidden locations. *See, e.g.,* 1980 U.S.C.C. & A.N. at 6121–22 (describing various practices at selected sites);

---

**8.** In addition to recognizing that waste generators benefited, as a group, from the pervasiveness of substandard dumping practices, *see, e.g.,* 1980 U.S.C.C. & A.N. at 6123; *id.* at 6140 (additional views of Rep. Gore), the Congress was mindful, in imposing liability on generators, that the economic realities of toxic waste disposal in this country have been such that generators are frequently "the only solvent, locatable parties with any connection to dumpsites targeted for clean-up under [CERCLA]." Note, *Gener-*

*ator Liability Under Superfund for Clean-Up of Abandoned Hazardous Waste Dumpsites,* 128 U.Pa.L.Rev. 1229, 1232 (1982); *see* 1980 U.S.C.C. & A.N. at 6125; *State of New York v. Shore Realty Corp., supra,* 759 F.2d at 1045 ("Congress had well in mind that persons who dump or store hazardous wastes sometimes cannot be located or may be deceased or judgment proof"); *U.S. v. Price, supra,* 577 F.Supp. at 1109.

126 Cong.Rec. S14,973 (daily ed. Nov. 24 1980) (remarks of Sen. Tsongas) (describing practices of " 'midnight dumpers' who dispose of toxic chemicals and hazardous materials in quarries, in streams, in forests, or spread them on open roads ..."); *id.* at 14,973 (remarks of Sen. Ford). And, legislators recognized that the problem of "midnight dumping" frequently involves waste that is transported over state lines. *See, e.g.,* 126 Cong.Rec. H9,461 (daily ed. Sept. 23, 1980) (remarks of Rep. Martin) ("because of the nature of clandestine dumping operations [a] State ... which does not generate a large volume of toxic waste, has been victimized as a dumping ground for waste from other States); 126 Cong.Rec. H11,798 (remarks of Rep. Edgar) (daily ed. Dec. 3, 1980) (" 'midnight dumpers' [have] trucked wastes from all over the Eastern Seaboard and dumped them illegally at various sites through [Pennsylvania]); 126 Cong.Rec. H9,448 (remarks of Rep. LaFalce) (daily ed. Sept. 23, 1980) (noting interstate scope of problem). This unfortunate history attests to the existence of a vast, unmonitored secondary toxic disposal market—one which, according to CERCLA's legislative history, weaves across state lines and reaches to every corner of this nation.

In the face of such a history, it is surely reasonable to assume that CERCLA actions may often involve generator defendants who arrange with an intermediary for waste disposal, and who lack direct knowledge as to how their waste may have come to arrive in a foreign state [9]—and lack, as well, independent contacts with that state.

It thus strikes the Court as incongruous to permit defendants to seek dismissal upon a showing that they did not *deliberately* affiliate themselves with a particular forum state. And while defendants in this case rightly point out that amenability to suit in a particular forum should not be confused with liability under the Act, the factors I discuss below suggest that there is an especially peculiar inconsistency between jurisdictional and liability rules in the case at hand.

Second, if the party suing to recover response costs and damages for cleaning up a single site is forced to bring several actions, in several states, in order to reach all those whose products may have been dumped at that site (but who may have few or no other contacts with the state), the increased litigation costs will obviously diminish that party's ultimate recovery and undermine the compensatory purposes of the statute. This is especially so where, as here, a state government, and not the EPA, is the party plaintiff, for states obviously lack the national litigation capacity of the federal government. Indeed, state governments faced with the prospect of maintaining multiple actions in multiple states may well forego suit against foreign defendants who cannot be haled into the forum. Reducing or eliminating the recovery available to states under CERCLA would be especially unfortunate because, as Congress recognized, it is state and local governments who have been historically saddled with the costs of cleaning up abandoned sites where no solvent owner can be

**9.** This is especially apparent in light of the fact that, as enacted, CERCLA includes only a limited defense to liability for defendants who have contracted out waste disposal—one that does not, by its terms, apply where the release is caused by the actions of a third party who is in a direct or indirect contractual relationship with the defendant. 42 U.S.C. § 9607; *see* Note, *Generator Liability Under Superfund for Clean-Up of Abandoned Hazardous Waste Dumpsites,* 128 U.Pa.L.Rev. 1229, 1250–65 (1982) (reviewing legislative history of provision and deletion of earlier provision according defendants a broader defense for unforeseen acts by third party); 1980 U.S.C.C. & A.N. at 6140 (additional views of Rep. Gore, sponsor of amendment limiting

third party defense) (asserting that company that "contract[s] out the job of waste disposal [should not be able to] contract away legal liability.") I emphasize, however, that I have no occasion to intimate a view here as to the proper reach of that defense.

I also have no occasion to consider here the relationship between the problem of illegal and improper dumping by third parties recognized by Congress, and the regulations currently promulgated under The Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. § 6901, *et seq.,* which now require generators to take certain steps to trace the disposal path of their wastes, *see* 40 C.F.R. §§ 262.20–23 (1984). RCRA is not directly in issue in this lawsuit.

found. *See* 1980 U.S.C.C. & A.N., at 6123. And, even where the federal government is suing, the increased costs of multiple lawsuits will necessarily diminish the amount of its recovery, and will consequently diminish the sum available to replenish the Superfund. *See* 1980 U.S.C.C. & A.N. at 6136 ("[t]he purpose of [the Act's liability provisions] is to provide a mechanism for prompt recovery of monies expended for the costs of such action from the [Superfund] from persons responsible therefor ..."); Note, *Generator Liability Under Superfund for Clean-Up of Abandoned Hazardous Waste Dumpsites, supra,* at 1232 (discussing importance, in statutory scheme, of replenishing the Superfund).

Third, in CERCLA actions in which multiple defendants are involved, there will invariably be—as there are in this case—numerous cross-claims among the defendants, and litigation as to the proper scope of joint and several liability, *see State of New York v. Shore Realty,* 759 F.2d 1032, 1042 and n. 1 (2nd Cir.1985) (discussing judicial role in formulating rules governing joint and several liability under the Act); contribution, indemnification, *see* 42 U.S.C. § 9607(e); and the like. If some defendants are not subject to the jurisdiction of the court in which the main action is brought, however, and fractionated proceedings in other states ensue, the proper resolution of these issues will inevitably be complicated and impeded.

As these observations suggest, I am of the view that a rule of nationwide service of process under CERCLA has much to commend it, and would be the rule most consistent with Congress' objectives. I am also mindful, however, that the decision whether to allow extraterritorial process is for the Congress, and not the courts, to make. For this is not simply a case of statutory construction where it falls to a court to interpret statutory ambiguity, or silence, in the manner suggested by the statute's legislative history and its purpose. Rather, by virtue of the approach pre-

scribed by the Federal Rules of Civil Procedure regarding personal jurisdiction in federal question cases, this is an instance where congressional silence is assigned a presumptive meaning—namely, that the federal district courts will observe the territorial limits of the respective states in which they sit. Absent any compelling reason to inquire further, as was present in the cases involving statutes that laid venue in only one district, I am constrained to find that Congress has not authorized nationwide service of process in CERCLA actions. In reaching this result, I am in accord with the Magistrate's decision, and with the only other federal decision of which I am aware on this question. *See Wehner v. Syntex Agribusiness,* 616 F.Supp. 27, 28 (E.D.Mo.1985) (concluding without discussion that CERCLA "does not authorize nationwide service of process").

### B. Minimum Contacts

The absence of a rule authorizing national jurisdiction does not, of course, end the inquiry. I must next decide whether, under governing standards of personal jurisdiction, the four defendants before me are subject to the jurisdiction of a Rhode Island court.

■ Before undertaking that inquiry, I turn to the motion of defendant AETC who, apparently alone among the four defendants, seeks its dismissal for want of personal jurisdiction based on the doctrine of *res judicata.* AETC sought and was granted a dismissal in the *Picillo I* action in the state court, upon that court's "determination that there is an absence of minimum contacts sufficient to subject defendant AETC to the jurisdiction of the courts of Rhode Island." *Bendick v. Picillo,* No. 77–3161 (R.I. Superior Court, May 17, 1984).[10] Final judgment dismissing AETC was entered on October 18, 1984. Contending that the state court has already determined the jurisdictional issue now before

---

**10.** Notwithstanding its differently named plaintiff, this is the same action as the one I have

referred to as *"Picillo I."*

me, AETC argues that I may not properly decide the issue anew. I agree.

■ It is settled that the doctrine of *res judicata* applies to questions of *in personam* jurisdiction. *See, e.g., Baldwin v. Iowa State Travelling Men's Association*, 283 U.S. 522, 51 S.Ct. 517, 75 L.Ed. 1244 (1931); *Rubaii v. Lakewood Pipe of Texas, Inc.*, 695 F.2d 541, 543 (11th Cir.1983); *see generally* 18 Wright, Miller & Cooper, *Federal Practice and Procedure* § 4430, at 291 (1981). And where a federal district court is asked to adjudicate a jurisdictional question previously resolved by a state court, the principle of full faith and credit embodied in the United States Code, 28 U.S.C. § 1738, likewise requires that the state court judgment be given the full effect to which it would be entitled in the courts of that state. *See generally Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982) (discussing full faith and credit statute). Having decided that CERCLA does not authorize nationwide service of process, there can be little question that the requirements for the application of *res judicata* recognized by the Rhode Island Supreme Court—identity of parties, identity of issues and finality of judgment, *see Gnys v. Amica Mutual Insurance Co.*, 121 R.I. 131, 396 A.2d 107, 116 (1979), *Air-Lite Products, Inc. v. Gilbane Building Co.*, 115 R.I. 410, 347 A.2d 623 (1975)—have been met in this instance. I therefore find that irrespective of how I might otherwise have decided the question, the Superior Court's judgment on the minimum contacts issue must be accorded preclusive effect. AETC is, therefore, dismissed from this action.[11]

■ Whether this Court has jurisdiction over the remaining three defendants depends upon whether it would comport with the "traditional notions of fair play and substantial justice," *International Shoe*

Co. *v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (citations omitted), rooted in the due process clause of the Fourteenth Amendment, to compel these parties to defend this litigation here. Because Rhode Island has extended its long-arm statute to the extent permitted by the federal Constitution, R.I.G.L. § 9–5–33; *see Roger Williams General Hospital v. Fall River Trust Co.*, 423 A.2d 1384 (R.I. 1981), there are no separate state statutory requirements for the exercise of jurisdiction. The fundamental question here is, thus, whether "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980). In judging whether sufficient minimum contacts exist to make an exercise of jurisdiction reasonable, "a court properly focuses on 'the relationship among the defendant, the forum and the litigation.'" *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 1486, 79 L.Ed.2d 804 (1984) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204, 97 S.Ct. 2569, 2579, 53 L.Ed.2d 683 (1977)). By way of guidance to courts charged with the task of evaluating this critical relationship, the Supreme Court has further explained that:

> Implicit in this emphasis on reasonableness is the understanding that the burden on the defendant, while always a primary concern, will in an appropriate case be considered in light of other relevant factors, including the forum State's interest in adjudicating the dispute, *see McGee v. International Life Ins. Co.*, 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957); the plaintiff's interest in obtaining convenient and effective relief, *see Kulko v. California Superior Court, supra*, 436 U.S. [84], at 92, 98 S.Ct. [1690], at 1697 [56 L.Ed.2d 132

---

11. Pointing to the fact that the state court, in the *Picillo I* action, denied the motion of defendant Hydron for a dismissal for lack of personal jurisdiction, the state argues here that it, too, is entitled to the benefits of *res judicata* against Hydron on this issue. The state is in error, however, because the state court's denial of Hy-

dron's motion is considered, under state law, an interlocutory order. *See* R.I.G.L. § 9–24–7; *DeMaria v. Sabetta*, 121 R.I. 648, 402 A.2d 738 (1979). The state cannot, therefore, satisfy the requirement for *res judicata* that there be a final judgment.

(1978) ], at least when that interest is not adequately protected by the plaintiff's power to choose the forum, cf. *Shaffer v. Heitner,* 433 U.S. 186, 211, n. 37, 97 S.Ct. 2569, 2583, n. 37, 53 L.Ed.2d 683 (1977); the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies, see *Kulko v. California Superior Court, supra,* 436 U.S., at 93, 98, 98 S.Ct., at 1697, 1700.

*World-Wide Volkswagen v. Woodson, supra,* 444 U.S. at 292, 100 S.Ct. at 564.

Determining whether, upon application of these general principles, it is "fair" and "reasonable" to subject defendants E, R & E, Rutgers and Hydron to the jurisdiction of this Court, raises novel and difficult questions.[12] Although a body of law has developed to guide courts in deciding jurisdictional questions where a nonresident manufacturer, distributor or merchant of a product is sued for injuries caused by the product in the forum state, *see generally World-Wide Volkswagen, supra;* 4 Wright & Miller, *Federal Practice and Procedure,* § 1067, at 38–44 (1984 Supp.), I have discovered few cases applying these principles to nonresident generators, transporters or handlers of hazardous waste products, who are called to answer in the forum state for damage caused by the disposal of their wastes there. Believing that the precedents dealing with product manufacture and sales nonetheless offer the closest analogy, I look primarily to those cases for guidance.

In *World-Wide Volkswagen,* the Court held that Oklahoma could not predicate jurisdiction over a New York automobile dealer and a New York automobile distributor (whose market was confined to New York, New Jersey and Connecticut), upon the fact that a car sold by these parties in New York was driven to Oklahoma and was involved in an accident there. Given the fact that these defendants had a "total absence of affiliating circumstances" with Oklahoma, 444 U.S. at 295, 100 S.Ct. at 566, and had in no way sought, themselves or "indirectly, through others," *id.,* to serve the Oklahoma market, the Court held that it would violate due process to base jurisdiction on such a single fortuitous circumstance. If merchants serving only a limited market were subject to suit wherever a product sold by them happened to be taken and cause injury, "[e]very seller of chattels would in effect appoint the chattel his agent for service of process. His amenability to suit would travel with the chattel," *id.* at 296, 100 S.Ct. at 566.

The Court in the *World-Wide Volkswagen* case was not directly confronted with the question whether jurisdiction in the action was proper over the international and national distributors of the car involved in the accident, for those parties, while defendants in that case, did not contest their amenability to suit. In dictum, however, the Court contrasted the situation of such distributors with that of local sellers, and made clear that jurisdiction could be asserted over these distributors, explaining:

> if the sale of a product of a manufacturer or distributor such as Audi or Volkswagen is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of

---

12. As set forth in the discussion of the jurisdictional facts in this case, both defendants E, R & E and Rutgers have certain limited contacts with the state of Rhode Island independent of the events at issue in this litigation. While contacts unrelated to the cause of action sued upon may properly form the basis for an exercise of "general jurisdiction," *see, e.g., Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *Glater v. Eli Lilly,* 744 F.2d 213, 215–16 (1st Cir.1984), the standard for such jurisdiction is "considerably more stringent," *id.* at 216, than the standard governing an exercise of "specific jurisdiction"—that is, where the cause of action arises out of the defendant's forum contacts. I conclude that neither E, R & E, nor Rutgers have independent Rhode Island contacts sufficient to justify general jurisdiction. The only question here is, therefore, whether specific jurisdiction over the three defendants is proper.

those States if its allegedly defective merchandise has there been the source of injury to its owner or to others. The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State. Cf. *Gray v. American Radiator & Standard Sanitary Corp.*, 22 Ill.2d 432, 176 N.E.2d 761 (1961).

*Id.* at 297–298, 100 S.Ct. at 567. As subsequent courts developing this pivotal distinction have explained, the key factors justifying a different jurisdictional rule are twofold.

First, unlike local merchants, such interstate distributors have an "interest in reaching as broad a market as" possible, *Bean Dredging Corp. v. Dredge Technology Corp.*, 744 F.2d 1081, 1085 (5th Cir.1984) and place their products into the stream of commerce with either the subjective intention, *see, e.g., Stabilisierungsfonds Fur Wein v. Kaiser*, 647 F.2d 200, 203 (D.C.Cir. 1981), or objective reason to know, *see, e.g., Oswalt v. Scripto*, 616 F.2d 191, 200–01 (5th Cir.1980) [13], that their products will be sold "to a nation-wide market, that is, in any or all states," *id.* at 200. Thus, even if their "products were sold indirectly through importers or distributors with independent sales and marketing schemes," *DeJames v. Magnificence Carriers, Inc.*, 654 F.2d 280, 285 (3d Cir.), *cert. den.* 454 U.S. 1085, 102 S.Ct. 642, 70 L.Ed.2d 620 (1981), (citations omitted)—independent parties whom the defendant distributors do not directly control, *Nelson by Carson v. Park Industries*, 717 F.2d 1120, 1126 (7th Cir.1983), *cert. den.*, — U.S. ——, 104 S.Ct. 1278, 79 L.Ed.2d 682 (1984)—and even if their products are sold to an intermediary with " 'no indication whatsoever as to their ultimate destination,' " *Bean Dredg-*

*ing Corp. v. Dredge Technology Corp.*, *supra*, 744 F.2d at 1085 (quoting party's brief), the fact that these manufacturers or distributors place their products in a stream of commerce destined for sale through a broad interstate market, and reap the attendant benefits, renders them properly subject to suit in one of the states comprising that market.

The second important distinguishing factor is that, unlike local merchants serving a self-circumscribed market, who "ordinarily [have] no control over where the buyer takes the product after it is sold," *Comm. of Puerto Rico v. S.S. Zoe Colcotroni*, 628 F.2d 652, 669 (1st Cir.1980), *cert. den.* 450 U.S. 912, 101 S.Ct. 1350, 67 L.Ed.2d 336 (1981), parties operating on a broad interstate scale can act "to limit the states in which [their products will] be sold," *Bean Dredging Corp.*, *supra*, 744 F.2d at 1085, and can thereby protect themselves against suit in an undesired forum. *See World-Wide Volkswagen v. Woodson*, *supra*, 444 U.S. at 297, 100 S.Ct. at 567 (potential defendants can "structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit"); *Oswalt v. Scripto*, *supra*, 616 F.2d at 200 (distributor could have limited the states in which its products would be sold); *Rockwell International Corp. v. Costruzioni Aeronautiche*, 553 F.Supp. 328, 333 (E.D. Pa.1982) (manufacturer could have limited the states in which its products would be sold).

Applying these teachings to the case before me, I find that jurisdiction is proper over defendants E, R & E, Rutgers and Hydron. Although those defendants attempt to liken themselves to the local sellers in these products liability cases, on the record before me, defendants are more properly analogized to the interstate distributors and manufacturers. I fully rec-

---

**13.** As the Fifth Circuit cogently explained in *Oswalt v. Scripto, supra*, 616 F.2d at 200–201, the distinction between what a defendant *actually knew*, and what it *should have known*, is, for jurisdictional purposes, "a distinction that makes no difference," *id.* at 200 (footnote omit-

ted). This is so because it is the concept of "reasonable-ness," as initially set forth in *International Shoe*, and reaffirmed in *World-Wide Volkswagen*, that is the touchstone of the jurisdictional analysis.

ognize that applying these principles to generators of hazardous wastes requires some extension of these principles beyond the context in which they were originally developed, but I believe that such an extension is warranted, indeed required, here.

The factual circumstances present here strongly indicate that each defendant should have known, if it did not, in fact know, that it was dispatching its hazardous chemical wastes into a stream of commerce broad enough to include *"any* or *all* states," *Rockwell Intern. Corp. v. Costruzioni Aeronautiche, supra,* 553 F.Supp. at 333 (emphasis in original). In substance, what each defendant did was to place its wastes in the hands of an intermediary—one who, according to the record, quite literally operated in more than one state—with no reasonable expectation as to where these materials were destined for disposal, and with no attempt to specify the location, or even the state, in which its wastes were to be disposed. This chosen course of conduct must be viewed in the context of a hazardous waste disposal industry recognized by Congress to be permeated, on a national scale, by problems of improper waste disposal, and in particular by problems of dumping wastes—frequently taken across state lines—at illegal, inappropriate or remote sites.[14] When so viewed, each defendant's decision to send its toxic wastes on a virtual one-way journey to anywhere represents a decision to avail itself of the benefits of a potentially boundless national disposal market.

Certainly, benefits flowed to the defendants as a result of their chosen means of disposing of their wastes. They transferred from themselves to a third party the burdens of properly transporting and locating hazardous waste for disposal, and of ensuring safe and environmentally sound disposal. Because disposal of wastes that are the by-products of defendants' commercial (or research) activities is a necessary predicate for continued activity, the benefits of these transferred burdens are significant. To be sure, the benefits inuring to these waste generators are not precisely like in kind to those enjoyed by the ordinary interstate distributor or manufacturer, whose profits grow as its market enlarges, and who seeks deliberately to reach as broad a market as possible. Yet, while these generator defendants may not have had a discrete commercial interest in spreading their toxic wastes through as broad a disposal network as possible, there can be no doubt, and Congress recognized as much, that the continued availability, and expansion, of a secondary, substandard disposal market has carried economic benefit for the industry as a whole.

Moreover, this is not a situation in which the product placed in the stream of commerce is an ordinary one. Rather, these defendants dispatched into that stream volatile and dangerous toxic substances—and did so without determining where these substances would come to rest. As other courts have recognized, and as common sense suggests, where a defendant deals in such inherently dangerous products, a lesser showing than is ordinarily required will support jurisdiction. *See Poyner v. Erma Werke GMBH,* 618 F.2d 1186, 1192 (6th Cir.1980); *Velandra v. Regie Nationale Des Usines Renault,* 336 F.2d 292, 298 (6th

---

14. In addition to the discussions of these problems appearing in the portions of the legislative history of CERCLA previously noted in this opinion, the legislative history of the Resource and Conservation Act, *see* note 7, *supra,* may be consulted for further congressional findings on the problems associated with hazardous waste travelling "in interstate commerce without adequate monitoring of its movement or disposition," H.R.Rep. No. 94–1491, Part I, 94th Cong., 2d Sess. (1976) (*reprinted in* 1976 U.S.C.C. & A.N. 6238, 6241). *See, e.g., id.* at 6239–6243; at 6242 ("[t]he fact that waste itself is in interstate and intermunicipal commerce has raised a number of problems. (Generally, hazardous waste is more likely to be the subject of interstate transportation than is non-hazardous industrial or municipal waste)"); at 6249 (because of "present disposal practices for hazardous wastes ... [wastes are] generated, transported and buried without notice until the evidence of its presence is seen in persons or the environment"); at 6274–78; at 6325–26; *Cf. id.* at 6264 (congressional intent that regulations be promulgated that obligate generators to keep records as to carriers and "intended destination of the waste").

**1578**

Cir.1964); *cf. Value Engineering Co. v. Gisell,* 140 Ga.App. 44, 230 S.E.2d 29 (1976). This is especially so where, as here, the defendants engage in heavily regulated activities, such that it is reasonable for them to foresee, given their chosen course of conduct, having to litigate in a distant forum. *See generally G.R.M. v. Equine Inv. and Man. Group.,* 596 F.Supp. 307, 317 (S.D.Tex.1984).

Nor were defendants powerless to protect themselves from having to litigate in Rhode Island.[15] Rather than engaging an intermediary, and giving that intermediary what appears on this record to be complete discretion in locating its wastes for disposal, each defendant could have handled its own waste. Alternatively, each could have selected, or participated in selecting, a disposal site, could have contractually required that its wastes be disposed there, and could have acted to ascertain that its waste was, in fact, finally deposited at this predetermined site.[16] By choosing, instead, an open-ended course, the defendants, like the interstate distributors and manufacturers in the previously discussed cases, did not take steps, as they could have, so as to "be reasonably certain that [they] would not be haled into court in an undesired forum." *Comm. of Puerto Rico v. S.S.*

*Zoe Colcotroni, supra,* 628 F.2d at 670 (insurer with no direct business contacts in Puerto Rico is subject to jurisdiction there in suit for environmental damage caused by tanker oil spill, where it chooses to insure vessels that travel to Puerto Rico; "[b]y limiting its coverage to specified jurisdictions, [the insurer] could be reasonably certain it would not be haled into court in an undesired forum ... an insurer is not at the mercy of the insured owner's unilateral choice of destinations in the same way a seller of chattels is at the mercy of the buyer"). Without regard to whether any state or federal law required them to undertake such steps—a question I need not and do not consider—I find that having failed to structure their primary conduct to provide themselves with minimal assurance as to where they would be compelled to defend hazardous waste litigation, defendants may not now reasonably claim unfair surprise or undue burden in being called to answer in a state where their hazardous substances are alleged to have caused harm.

This conclusion is buttressed by the fact that all of the other factors enumerated by the *World-Wide Volkswagen* court as bearing on the reasonableness of jurisdiction strongly favor a Rhode Island forum.

**15.** The defendants need not have known that their waste was destined to travel to Rhode Island, in particular. The import of the cases finding jurisdiction over interstate manufacturers and distributors is that it is critical that defendants knew, or should have known, that their chosen method of disposal destined their waste to travel through a market broad enough to include any state. *See, e.g., Bean Dredging Corp. v. Dredge Technology, supra,* 744 F.2d at 1085.

**16.** Where a waste generator chooses to dispose of its waste in such a manner, it would not likely be amenable to jurisdiction in a forum with which it had no other contacts, if its waste products happened to turn up there. Unlike the defendants here, such a generator could not properly be said to have availed itself of a broad national disposal market.

In protest, Rutgers would make much of the fact that it required, as a contract condition, that its broker AETC, and AETC's sometime-consignee CCC, provide proof of licensing to "conduct waste disposal activities in Rhode Island." Aff. of Daniel B. Howell, at ¶ 4(c)–(d). Rutgers believes that this fact makes reasonable its pro-

fessed "expectation" that its waste would be disposed only in New Jersey. The record suggests otherwise. During the relevant time period, AETC sent much, if not a majority, of the waste it brokered to New York. Thus, the fact that AETC (or any party, including CCC) was *licensed* in New Jersey cannot itself mean that any waste handled by it was necessarily disposed there.

Nor does Rutgers (or, for that matter, E, R & E) purport to have requested, required, or otherwise taken steps reasonably calculated to ensure disposal only in New Jersey. Likewise, Hydron arranged for a Connecticut party to come to New Jersey to pick up its wastes, and, while it believed that party had a permit and/or dump in Connecticut, it purports to have taken no reasonable steps to ensure Connecticut disposal—and, indeed, freely admits that it did not know where its wastes would be disposed. And none of the defendants claims even to have taken steps reasonably calculated to determine in what state, and by whom, their wastes were finally deposited.

Certainly Rhode Island's interest in adjudicating this suit could hardly be more compelling. In addition to the state's recognized "significant interest in redressing inquiries that actually occur within the State," *Keeton v. Hustler Magazine*, 465 U.S. 770, 104 S.Ct. 1473, 1479, 79 L.Ed.2d 790 (1984), Rhode Island has an extraordinarily strong sovereign interest in providing a forum for actions concerning injury to land within its borders, and for actions which seek recovery of public monies expended to protect such land. Likewise the interest of the plaintiff state government "in obtaining convenient and effective relief," *World-Wide Volkswagen, supra*, 444 U.S. at 292, 100 S.Ct. at 564, fairly depends upon its being able to litigate this action in a single forum. In such multiparty, potentially labrynthine litigation, it will no doubt substantially burden the state to force it to proceed in parallel or piecemeal actions— and doubly so in light of the limited litigation resources available to a state government.

The interests of "the interstate judicial system ... in obtaining the most efficient resolution of" this dispute, *id.*, would plainly be served by a single adjudication of the questions raised here—all of which pertain to the same series of events at the Picillo farm. Given the matrix of cross-claims and defenses raised, and likely to be raised here, *see supra*, at 1573, considerations of economy and justice alike weigh heavily in favor of a Rhode Island forum. And even if one were appropriate, there is no apparent alternative forum into which all parties could be brought.

Lastly, the several states of this nation surely share an important substantive interest in furthering policies designed to mitigate the widespread effects of improper management and disposal of hazardous chemical wastes. Each state's ability to utilize its own legal tools in this area, as well as those provided by the federal government, depends significantly on each state's ability to reach parties whose disposal activities have harmed its environment and its population. Because state (and local) treasuries have shouldered the greatest financial burden in cleaning up toxic waste sites where no solvent responsible party is locally available, there can be no doubt that this shared substantive interest is a powerful one.

Accordingly, for the foregoing reasons, I hold that a *prima facie* showing has been made that defendants E, R & E, Rutgers, and Hydron are properly subject to the jurisdiction of this court.[17] The motions for dismissal of defendants E, R & E, Rutgers and Hydron are denied, and the Magistrate's recommendation regarding Rutgers' motion is, correspondingly, rejected. For the reasons previously given, the motion of defendant AETC is granted.

SO ORDERED.

---

17. I emphasize that only a *prima facie* showing of jurisdiction has been made here. Although no further pretrial motions on this question by defendants E, R & E, Rutgers and Hydron will be entertained, I recognize that:

the final determination of the key fact issues bearing on jurisdiction over the person will be made at trial. If they are decided in a way that defeats jurisdiction as to [any] defendant, as to that defendant plaintiff's action will then be subject to dismissal for want of jurisdiction over the person.

*North American Video v. Leon, supra*, 480 F.Supp. at 216.