**CHATTANOOGA CORPORATION**

v.

Dale H. KLINGLER, Harlan B. Jensen,
Thomas H. Church, Richard Wilkins,
Lewis C. Duncan, M. D. and James W.
Sauder.

No. Civ-1-81-145.

United States District Court,
E. Tennessee, S. D.

Dec. 3, 1981.

John B. Phillips, Jr. and Hoyt O. Samples, Stophel, Caldwell & Heggie, Chattanooga, Tenn., for plaintiff.

Hugh J. Moore, Jr., Witt, Gaither & Whitaker, Chattanooga, Tenn., V. Frank Asaro, Asaro & Associates, San Diego, Cal., for defendants.

## OPINION

FRANK W. WILSON, Chief Judge.

This lawsuit arises out of the purchase by a Tennessee corporation of the corporate assets of a California corporation. Included within the assets purchased were four patents. A portion of the purchase price consisted of the payment by the purchaser of patent royalties to the sellers. The plaintiff contends that it no longer markets a product that comes within the patent claims and seeks a declaration relieving it of the payment of further patent royalties.

The case is presently before the Court upon a motion to dismiss filed on behalf of each defendant, or in the alternative, a motion to change the venue of the lawsuit. The defendants having initiated arbitration proceedings in California that are related to the matters here sought to be litigated, the case is also before the Court upon the plaintiff's motion for a preliminary injunction staying the California arbitration proceedings.

Before considering the plaintiff's motion for an injunction, it will be necessary for the Court to decide the jurisdiction and venue questions. It may also be appropriate for the Court to consider whether this declaratory judgment action should be dismissed as a matter of judicial discretion. A review of the facts is necessary.

Vari-Temp Manufacturing Corporation, until its dissolution in 1977, was a California corporation with its principal place of business and only office in San Diego County, California. This office served as corporate headquarters, sales office, and manufacturing facility. Vari-Temp had some distributors who operated outside San Diego County, but none in Tennessee. These distributors handled other products besides those of Vari-Temp and Vari-Temp conducted none of its normal ongoing business in Tennessee and was not qualified to do business in Tennessee. Defendant Klingler resides in San Diego County, California, and was president of Vari-Temp. Defendant Sauder resides in Reno, Nevada, and was also active in the affairs of Vari-Temp. The other four defendants in this case were the sole remaining shareholders of Vari-Temp but they were only passive investors. Duncan resides in San Diego County, California. Jensen and Church reside in Burley, Idaho, and Wilkins in Alto Loma, California. Klingler owned a controlling interest in Vari-Temp while the other defendants owned varying amounts up to a 15% interest.

In July, 1977, the president of Chattanooga Corporation contacted Vari-Temp about the possible sale of Vari-Temp's assets, in-

cluding its patent rights. Negotiations were conducted in St. Louis, Salt Lake City, Chattanooga, and finally concluded in San Diego. Only Klingler went to Chattanooga at plaintiff's request to conduct negotiations on behalf of all the defendants. Miscellaneous phone calls and correspondence between the parties also took place and had Chattanooga as its origin or destination.

To accomplish the sale of assets, Vari-Temp was dissolved on August 22, 1977, and its assets distributed to the six shareholders. On August 31, 1977, in San Diego, California, the six former shareholders sold the former assets of Vari-Temp to Chattanooga Corporation as specified in a Memorandum of Sale which was to be governed by the laws of California. A Bill of Sale and Assignment transferred title to the assets and patents from the defendants to Chattanooga Corporation. Defendants Klingler and Sauder were briefly employed by Chattanooga Corporation to assure a smooth transition but such employment ended in 1977. Sauder's employment contract was executed and performed completely in California, but Klingler made two trips to Chattanooga in the course of his employment. Chattanooga Corporation has made payments of $205,000 as "minimum royalties" as required by the Memorandum of Sale, ¶ 7, but seeks to be relieved of any further payments on the ground that it is not manufacturing products which utilize the patented inventions. The patents relate to inventions used in cold therapy apparatus which is useful in the field of physical therapy. Service was had on the defendants under the Tennessee Long Arm Statute through the Secretary of State as allowed by F.R.C.P. 4.

The first question to be faced is one of jurisdiction. Subject matter jurisdiction is not disputed. If the case arises under patent law, as plaintiff contends, then this Court has jurisdiction under the federal question provision, 28 U.S.C. § 1331. If the case instead arises under contract law, as defendants contend, then the Court has diversity jurisdiction under 28 U.S.C. § 1332.

The question of *in personam* jurisdiction is more difficult. In a diversity case, the jurisdictional reach of a United States District Court is determined by the law of the state where the court is located, *Pickens v. Hess*, 573 F.2d 380 (6th Cir. 1978). In a federal question case, the District Court's power to exercise *in personam* jurisdiction is limited to that provided by the *Federal Rules of Civil Procedure*, and because it was necessary to utilize state long-arm provisions to obtain service of process, *in personam* jurisdiction is also limited by the Tennessee Long Arm Statute. *See Wells Fargo & Co. v. Wells Fargo Exp. Co.*, 556 F.2d 406 (9th Cir. 1977); *Navarro v. Sedco, Inc.*, 449 F.Supp. 1355 (S.D.Tex. 1978). As a result, whether the case is properly a diversity case or a patent case, the Tennessee Long Arm Statute, TCA § 20–2–214, will be applicable. That broadly phrased statute is limited only by Fourteenth Amendment due process considerations, *Nicholstone Book Bindery, Inc. v. Chelsea House Publishers*, 621 S.W.2d 560 (Tenn.1981).

The Supreme Court has recently reaffirmed its holding in *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), that a state cannot exercise personal jurisdiction over a nonresident defendant unless "minimum contacts" exist between the defendant and the forum state. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). *International Shoe* was a landmark in jurisdictional thinking as it expanded jurisdiction far beyond the strictly territorial notions espoused by *Pennoyer v. Neff*, 95 U.S. 714, 24 L.Ed. 565 (1877). In *Pennoyer*, States were held to be unable to extend their process beyond their territorial limits, in the usual case. Any extra-territorial reach by a state's courts was viewed as an encroachment on the rights of the other states and was to be "resisted as usurpation."

In light of the harsh limitations of *Pennoyer*, the *International Shoe* decision was a welcome addition to the states' jurisdictional powers. The new test for jurisdiction stated that:

"... due process requires only that in order to subject a defendant to a judgment *in personam,* if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" 326 U.S. at 316, 66 S.Ct. at 158.

The nature of the minimum contacts required to satisfy due process considerations was explained in *McGee v. International Life Insurance Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957) and *Hanson v. Denckla,* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). In *McGee,* California was allowed to assert jurisdiction over a Texas insurance company whose only contacts with the state consisted of mailing an insurance contract to a California resident and receiving his mailed premium payment. The Court was influenced by the following factors: (1) the suit was based on a contract which had substantial connection with California; (2) California had a manifest interest in providing effective means of redress to its residents when insurers refused to pay claims; (3) the inability of small or moderate individual claimants to afford the cost of an action in a foreign forum; and (4) the crucial witnesses' location in California.

In *Hanson* the Court indicated that not all restrictions upon the exercise of personal jurisdiction were to be abandoned. The case involved Delaware's refusal to accord full faith and credit to a Florida probate decision purporting to decide the distribution of the corpus of a Delaware trust. The Court held that Florida could not exercise jurisdiction over the Delaware trust company based on contacts which were only minor matters of trust administration conducted by mail. Chief Justice Warren, in his majority opinion, noted that the restrictions on personal jurisdiction were a consequence of territorial limitations on the power of the respective states, at p. 251, 78 S.Ct. at p. 1238. In this regard he found that Florida did not have a substantial connection with the contract on which the suit was based, at p. 253, 78 S.Ct. at p. 1239. A critical portion of the opinion read:

"The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State. The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting business within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958).

In *Kulko v. California Supreme Court,* 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978), the Court declined to allow California to exert personal jurisdiction over a New York resident. The New York defendant's wife had obtained a Haitian divorce and subsequently sought to have the child support agreement modified in California, her new domicile, after the husband had allowed one child to live with her year round. The Court noted that the child support agreement was negotiated and signed in New York, that it contemplated sending payments to California, that California had an interest in the welfare of minors within the state, that the husband had consented to one child's desire to live with her mother in California and still found that California's assertion of personal jurisdiction was unreasonable. The Court found the child support agreement had virtually no connection with the forum state, at p. 97, 98 S.Ct. at p. 1699, and thought New York was the appropriate forum. California's interest in its minor residents was found neither specific nor strong enough to outweigh the fact that the husband derived no personal or commercial benefit from his child's presence in California and who could not be said to have purposefully availed himself with privileges and protections of conducting activities in California. The unilateral nature of the wife's move to California was a substantial consideration in denying jurisdiction.

*World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d

490 (1980) is the most recent word on *in personam* jurisdiction. The plaintiff sought to obtain jurisdiction over the New York wholesaler and retailer of his Audi for a products liability action in Oklahoma where the automobile had been involved in an accident. The New York defendants' only apparent connection with the forum state was that the plaintiff had driven a car he had purchased in New York from the retailer to Oklahoma and been involved in an accident. The Court explicitly stated that the minimum contacts requirement retained a notion of the state sovereignty principle which many had assumed met its demise with the downfall of *Pennoyer.* The Court said:

> "The concept of minimum contacts, in turn, can be seen to perform two related, but distinguishable functions. It protects the defendant against the burdens of litigating in a distant or inconvenient forum. And it acts to ensure that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." *Supra* at 291–292, 100 S.Ct. at 564.

The Court pointed out that due process guarantees against inconvenient litigation have been substantially relaxed since *McGee* but insisted that the principles of interstate federalism embodied in the Constitution require that state lines remain relevant for jurisdictional purposes.

The plaintiffs in the present case place a great deal of emphasis on the case of *Southern Machine Co. v. Mohasco Industries, Inc.,* 401 F.2d 374 (6th Cir. 1968). That case set forth a three-part test to which plaintiffs endeavor to fit their case. Under *Mohasco, in personam* jurisdiction is present if:

> "First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." *Supra* at 381.

While *Mohasco* does provide insightful analysis of due process questions posed by long-arm statutes, the additional emphasis placed by the Supreme Court on matters of federalism and state sovereignty seem to displace *Mohasco* as the controlling law. To fully understand the changes that have occurred since the 1968 decision in *Mohasco,* it is necessary to examine the state sovereignty considerations in some detail.

In 1887 when *Pennoyer* was decided, state sovereignty was strictly a matter of territorial boundaries. A state could not exercise its power beyond its political boundary. Today, state sovereignty is viewed in a somewhat broader fashion and the interest protected is explained by one commentator as, "The threat to state sovereignty derives from the fact that if one state can adjudicate the rights of any defendant no matter where he is located, the sovereignty of the other states is diminished," Allen R. Kamp, *Beyond Minimum Contacts: The Supreme Court's New Jurisdictional Theory,* 15 Ga.L.Rev. 19, 37 (1980). Every time a state exercises long-arm jurisdiction over a nonresident defendant, it deprives another state of control over one of its own residents. Unwarranted extension of long-arm jurisdiction is an inherent danger to a coordinated system of state courts. *See* Comment, 69 Mich.L.Rev. 300 (1970). The problem of state sovereignty is to decide how much protection to accord the federalistic values it encompasses.

■■ In *Mohasco,* the Court of Appeals concluded that the forum state had an interest in the controversy and this satisfied its third criterion. However, the Supreme Court did not deny that California had an interest in child support for its minor residents in *Kulko,* or that Oklahoma had an interest in injuries caused by defective products within its confines in *World-Wide Volkswagen.* The Supreme Court in *Kulko* found that California's exercise of jurisdiction was "unreasonable" because of the superior affiliation of New York with the controversy in that case. Similarly, *World-*

*Wide Volkswagen* held that the defendants' contacts with Oklahoma did not constitute sufficient "affiliating circumstances" to allow long-arm jurisdiction. In short, the interest of the forum state in the controversy must not merely exist, it must also be found to be sufficient in light of other states' interests and the defendant's contacts with the forum. The best interests of international and interstate judicial systems require that a forum state should not impinge on interests of other states by trying in its courts a case with which it has no adequate relationship, *Lakeside Bridge & Steel v. Mountain State Construction*, 597 F.2d 596 (7th Cir. 1979).

While the development of the state sovereignty requirement has been greeted with consternation in some quarters, Allen R. Camp, *Jurisdictional Theory*, 15 Ga.L.Rev. 19 (1980), *The Supreme Court, 1979 Term*, 94 Harv.L.Rev. 75, 114 (1980), the fear of a return to the mutually exclusive territorial sovereignty of *Pennoyer* seems unfounded. The interests of other states appear to be merely one more factor in determining the nature and quality of a defendant's contacts with a state that will serve as the basis for the exercise of personal jurisdiction. The minimum contacts test is not susceptible of mechanical application, *Kulko*, 436 U.S. at 92, 98 S.Ct. at 1696, and state sovereignty considerations are one more factor to be weighed to determine whether the requisite affiliating circumstances are present.

It appears that in applying the minimum contacts test the requisite amount of contacts should vary according to the state's interest. *See Comment*, 69 Mich.L. Rev. 300 (1970), Carrington & Martin, *Substantive Interests and the Jurisdiction of State Courts*, 66 Mich.L.Rev. 227 (1967). It is suggested that a state has a greater interest in personal injury cases, the physical welfare of its inhabitants, than in economic injury. And also a greater interest in protecting the economic reliance interests of its residents than the expectation interests, Carrington & Martin, 66 Mich.L.Rev. 227 (1967). If convenience and reasonableness weigh in favor of the forum state—the "center-of-gravity" test—less contacts should be required. *See* Allen R. Kamp, 15 Ga.L.Rev. 19 (1980). The center-of-gravity of the instant case appears to be in San Diego County rather than Tennessee. The neutrality of the forum is a factor favoring reduced contacts, Mehren & Trautman, *Jurisdiction to Adjudicate: A Suggested Analysis*, 79 Harv.L.Rev. 1121 (1966). In the instant case, California would probably be slightly more neutral than Tennessee since Tennessee is the domicile of the only plaintiff, while California is the domicile of only half the defendants. The essentially local character of a defendant requires more substantial contacts in the forum state, Mehren & Trautman, *supra*. Vari-Temp was essentially a California operation. If the cause of action arose from tortious or wrongful activity contacts may be minimized, *Jasper Aviation, Inc. v. McCollum Aviation, Inc.*, 497 S.W.2d 240 (Tenn.1972). But the defendants are not accused of such conduct. Contacts might also be minimized if the claim involves the placing of a dangerous instrumentality in commerce, *Poyner v. Erma Werke Gmbh.*, 618 F.2d 1186 (6th Cir. 1980), but no such instrumentality is involved in this case. If Tennessee has a valid regulatory interest, few contacts might be required, but Tennessee's interest stems almost exclusively from wishing to provide a forum for its residents. California has an interest in supervising the application of its laws, which could be applicable should contract questions need to be answered in this case. The forum which can provide the most efficient judicial administration of the claim may also require less contact. This factor predominates only slightly in California's favor.

This analysis shows that the interest of California in the adjudication of this controversy is somewhat greater than Tennessee's interest. As a result, Tennessee should be required to have somewhat more than the absolute minimum of contacts which might provide personal jurisdiction, in order to warrant depriving California of jurisdiction over a case with which it has a more substantial connection.

To examine the contacts of the defendants with Tennessee, the forum state, it is necessary to analyze those contacts in relation to the defendants' realistic expectation that they would be haled into court in Tennessee, *World-Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct. at 567. *In Flight Devices Corporation v. Van Dusen Air, Inc.*, 466 F.2d 220 (6th Cir. 1972) provides insightful analysis of the nature and quality of a defendant's contacts with the forum state regarding the expectation of litigation. It suggests that the active initiation of a deal in the forum state, vigorous and substantial negotiation in the state, inspection of facilities in the state, the discussion of marketing approaches in the state, and the existence of substantial interstate business all favor finding meaningful contacts existed, heralding the possibility of litigation in the forum state. The conduct of the four passive investors in Vari-Temp can hardly be said to fit this categorization. Those four apparently authorized Klingler to act as their agent and Klingler was in touch with Chattanooga by phone and mail and made one visit in person. The four passive defendants have also received payments sent from plaintiff's Chattanooga, Tennessee office.

Even given the knowledge that plaintiff would transfer Vari-Temp's assets to Chattanooga after winding down the California operation, the four passive investor defendants cannot be said to have purposefully availed themselves of the privilege of doing business in Tennessee. The unilateral conduct of the plaintiff in transferring Vari-Temp's assets to Tennessee cannot form the basis for exerting long-arm jurisdiction over the defendants. *See Lakeside Bridge & Steel v. Mountain State Construction*, 597 F.2d 596 (7th Cir. 1979). When coupled with the indication that long-arm jurisdiction is more easily asserted over corporations than individuals because of both financial deference to individuals and the increased regulatory power of states over corporations, *W. B. Dunavant & Co. v. Perkins*, 498 S.W.2d 905 (Tenn.1973), *Developments in the Law-State Court Jurisdiction*, 73 Harv.L.Rev. 909, 936 (1960), the Court has no difficulty in holding that an application of the Tennessee Long-Arm Statute to assert jurisdiction over the four passive investor defendants would constitute a violation of due process.

The finding that these four passive investor defendants did not purposefully avail themselves of the privilege of carrying on activities in Tennessee is the death knell for plaintiff's hopes to assert jurisdiction over those defendants. The purposeful availment requirement has been present in every case from *Hanson*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958) to *World-Wide Volkswagen*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Even the three-prong *Mohasco* test includes that requirement.

With respect to the remaining two defendants, the jurisdictional question is closer. Both defendants Klingler and Sauder were active in the management of Vari-Temp, Sauder as an inventor, and Klingler as President. Both were employed by plaintiff after the sale of Vari-Temp. The employment contracts were executed in San Diego County and Sauder performed his contract completely in California. Klingler made two trips to Chattanooga during the course of his employment. The employment contracts provided that the principal place of employment shall be San Diego but that the plaintiff could require the employees to travel and work in areas outside of San Diego. The Court has no difficulty in deciding that the employment contracts must be included in the consideration of minimum contacts for this cause of action as the defendants' employment was needed to assist Chattanooga Corporation in the transfer and winding up of Vari-Temp's business.

The nature of Klingler's actions make it appropriate for the Court to assert jurisdiction over him. By personally conducting the negotiations for the sale, Klingler indicated that he attached more significance to the negotiations and contacts with plaintiff than the passive investors who were content to let Klingler act as their agent. Furthermore, Klingler's position as

the majority stockholder of Vari-Temp makes it clear that even when performing corporate acts as Vari-Temp's president, he was acting largely in his own interests. The degree of Klingler's involvement in Vari-Temp, the negotiations with Chattanooga Corporation, and the subsequent employment contract all lead the Court to find him subject to the reach of the Tennessee Long-Arm Statute.

The defendant Sauder lacked the personal involvement in the negotiations with plaintiff and the control over Vari-Temp and high stake in Vari-Temp's disposition. While Sauder did have some relation to the ongoing business of Vari-Temp, the Court cannot find that he attached sufficient importance to his dealings with the plaintiff to assume he foresaw the possibility of being haled into court in Tennessee. Furthermore, unless it can be shown the nature of his employment involved more than the winding down of the California operation, the Court cannot see how he purposefully availed himself of the privileges of conducting business in Tennessee. Accordingly, it appears that the Court lacks personal jurisdiction over the defendant Sauder.

In light of this Court's failure to find jurisdiction over five of the six named defendants, the wisdom of issuing a declaratory judgment becomes questionable. In *Public Affairs Associates v. Rickover*, 369 U.S. 111, 82 S.Ct. 580, 7 L.Ed.2d 604 (1962) the Supreme Court stated that the Declaratory Judgment Act (28 U.S.C. §§ 2201, 2202) gave federal courts the competence to make a declaration of rights but did not impose a duty to do so. The District Courts cannot decline to entertain a declaratory action as a matter of whim or personal disinclination but should balance the needs of the plaintiff and the consequences of giving the desired relief. If the Court were to find in favor of the plaintiff, the plaintiff would then have to institute a proceeding in the Southern District of California urging *res judicata* to obtain the same judgment against the defendants not subject to this Court's jurisdiction. This would not be the most efficient use of judicial resources.

The strong public interest in determining patent validity in order to prevent invalid patents from withdrawing knowledge from the public realm, *Lear v. Adkins*, 395 U.S. 653, 656, 89 S.Ct. 1902, 1903, 23 L.Ed.2d 610 (1969), is weakened in the present situation. The party holding the right to keep the patented invention from the public is the same party seeking to have the patent declared invalid. If the plaintiff is concerned that knowledge is being inappropriately denied the public, the plaintiff can act unilaterally to disseminate that knowledge. Plaintiff's interest is in defeating the defendants' claim for money due under the contract, not in averting harm to its business from a patent infringement suit or in providing the public with access to the inventions covered by the patents in this suit.

Declaratory judgments are problematical because such actions are often brought by a party who would otherwise have been a defendant in the action. They often have the effect of depriving a party who otherwise would have been the plaintiff of any choice in selecting the forum in which the lawsuit is initiated. Declaratory judgment actions which are obvious cases of forum shopping are not favored, *Hanes Corporation v. Millard*, 531 F.2d 585 (D.C.Cir. 1976). In the instant case, plaintiffs mailed letters dated April 20, 1980 to the defendants which repudiated the Memorandum of Sale and offered to tender back the patents involved in the sale. On April 21, 1980, without waiting for defendants to reply or even receive the letters, plaintiff filed suit. The appearance of forum shopping by such hasty instigation of legal action without prior notice to the defendants is unavoidable.

Another problem is that if this Court adjudicates plaintiff's claims, the agreement of the parties to arbitrate all disputes arising from the contract will not be given any effect. Courts are reluctant to preempt the resolution process agreed to by the parties. Though patent questions are probably not suitable for determination by an arbitrator, if the defendants' contentions

are correct, an arbitrator might be able to settle the controversy without reaching the patent issues.

The final consideration is an apparent inconsistency under the venue statutes. If this case is a patent action, then the federal question venue statute, 28 U.S.C. § 1391(b), would apply and venue would not appear to be proper in this district. Federal question venue is appropriate where all the defendants reside or where the claim arose. Since the defendants reside in different districts, the only proper district is where the claim arose. Plaintiff contends the claim arose where the patents are presently located, Chattanooga, because an infringement action arises on the site of the infringement. Defendants assert the claim arose in California where the contracts were signed.

The nature of the patent agreement is an assignment rather than a license as plaintiff received all the rights of an owner of patents, including the exclusive right to license the patents and the right to enforce the patents for infringement. [See Memorandum of Sale ¶ 7(c) & (g)] See Deller's *Walker on Patents* § 343, *Pope Mfg. Co. v. Gormally & Jeffery Mfg. Co.*, 144 U.S. 248, 12 S.Ct. 641, 36 L.Ed. 414 (1892), *Littlefield v. Perry*, 21 Wall. 205, 220, 88 U.S. 205, 220, 22 L.Ed. 577 (1875), *Dynatech Corp. v. Frigitronics, Inc.*, 318 F.Supp. 851 (D.Conn.1970). The defendants in this case could not even bring an infringement action as that right belongs solely to the plaintiff. The inescapable conclusion is that the cause of action arose under the contract and not because of infringement *per se.* If there is federal question jurisdiction because of the infringement nature of plaintiff's claim, Deller's *Walker on Patents* § 469, venue would only be proper in California.

To avoid this result, plaintiff could rely on the contract nature of the suit to obtain proper diversity venue where all of the plaintiffs reside, 28 U.S.C. § 1391(a). The problem with this is that if the action is predominantly a contract action, arbitration is the appropriate remedy under the contract.

The above considerations: the lack of jurisdiction over five of the defendants, the superiority of California as an appropriate forum, the lack of a strong public policy urging resolution of patent validity in this instance, the appearance of forum shopping, the venue problems, and the preemption of the parties' arbitration agreement all militate against this Court's exercise of its power to render a declaratory adjudication. While no one factor is controlling, the Court believes the combination argues in favor of the dismissal of this case. An order dismissing the action will enter.