CHESTER LICHON, Plaintiff, v. ACETO CHEMICAL COMPANY, LTD., Defendant and Third–Party Plaintiff-Appellant (J.D. Campbell Sales, Ltd., Third–Party Defendant-Appellee).

First District (3rd Division)  No. 1—88—2253

Opinion filed April 19, 1989.—Rehearing denied June 7, 1989.

Michael S. Danian, of Waukegan, for appellant.

McCullough, Campbell & Lane, of Chicago (Michael C. Cook and Henry T. French, Jr., of counsel), for appellee.

PRESIDING JUSTICE FREEMAN delivered the opinion of the court:

Plaintiff, Chester Lichon, filed suit against defendant, Aceto Chemical Company, Ltd. (Aceto), in the circuit court of Cook County for personal injuries sustained when he came in contact with drums leaking a chemical known as Phorate Technical, owned by Aceto. Aceto filed a third-party complaint for contribution against the Phorate's manufacturer, J.D. Campbell Sales, Ltd. (Campbell), an English company. Service of summons was had upon Campbell in England. Pursuant to Campbell's motion, the trial court dismissed Aceto's amended third-party complaint for lack of personal jurisdiction on the basis of *Asahi Metal Industry Co. v. Superior Court* (1987), 480 U.S. 102, 94 L. Ed. 2d 92, 107 S. Ct. 1026. Aceto appeals.

Aceto's amended third-party complaint alleged the following facts. Campbell shipped 72 drums of Phorate Technical from Greenock, England, to Port Seatrain, Weehawken, New Jersey, for Aceto. The Phorate Technical was intended for delivery to Aceto's customer, Aidex, in Council Bluffs, Iowa. On December 12, 1976, the truck transporting the Phorate to Iowa overturned. On December 15, it was discovered at the Chicago terminal of the trucking company that the drums of Phorate were leaking. The record further reveals that Phorate Technical is used in the manufacture of insecticides.

Aceto also alleged that Campbell knew or should have known that Aceto would transport the Phorate by truck and that, given the highly toxic nature of Phorate, drums of adequate strength and labeling would be required in the event of an accident. Aceto alleged that Campbell's negligent failure to provide adequate containers and labelling was the proximate cause of the leaking drums and the injuries to plaintiff.

OPINION

In *Asahi*, eight justices agreed that the State of California's exercise of jurisdiction over a Japanese defendant would be fundamentally unfair, *i.e.*, not in keeping with "traditional notions of fair play and substantial justice." (*Asahi*, 480 U.S. at 113, 94 L. Ed. 2d at 105, 107 S. Ct. at 1033.) The court stated that the reasonableness of the exercise of jurisdiction depended in each case on the burden to the defendant, the interests of the forum State, the plaintiff's interest in obtaining relief and the interests of other States or, as in the case before it, other nations in obtaining the most efficient resolution of controversies. *Asahi*, 480 U.S. at 113, 94 L. Ed. 2d at 105, 107 S. Ct. at 1033-34.

The justices split, however, over whether the Japanese defendant otherwise had sufficient minimum contacts with the State of California to allow California to exercise jurisdiction over it.

Justice O'Connor, with whom three justices concurred, stated that "the substantial connection," necessary for minimum contacts between a defendant and forum State "must come about by an action of the defendant purposefully directed toward the forum State." She further held that placing a product into the stream of commerce was not such an act "without more." Finally, Justice O'Connor held that a defendant's "awareness that the stream of commerce may or will sweep the product into the forum State did not convert the mere act of placing the product into the stream" into an act purposefully directed at the forum State. Because the Japanese defendant neither solicited, did business, advertised, had offices, agents, employees or property in California, nor created, controlled or employed the distribution system that brought its valves to California, Justice O'Connor concluded that it had not purposefully availed itself of the California market. *Asahi Metal Industry Co. v. Superior Court* (1987), 480 U.S. 102, 112, 94 L. Ed. 2d 92, 104, 107 S. Ct. 1026, 1033 (opinion of O'Connor, J., joined by Rehnquist, C.J., and Powell and Scalia, JJ.).

Justice Brennan, with whom three justices also concurred, concluded that a defendant's mere awareness that the stream of commerce would sweep its product into the forum State sufficed to establish the minimum contacts necessary for an exercise of jurisdiction over the defendant by the forum. Justice Brennan reasoned that as long as a participant in the stream of commerce, *i.e.*, the regular, anticipated flow of products from manufacture to distribution to retail sale, was aware that the final product would be marketed in the forum State, the possibility of a lawsuit there could not come as a surprise. Justice Brennan believed that benefits to such a defendant ac-

crued regardless whether it directly conducted business in the forum State or engaged in additional conduct directed toward that State. *Asahi Metal Industry Co. v. Superior Court* (1987), 480 U.S. 102, 116, 94 L. Ed. 2d 92, 107, 107 S. Ct. 1026, 1035 (opinion of Brennan, J., joined by White, Marshall and Blackmun, JJ.).

On appeal, Aceto contends that the requirements of the unanimous opinion in *Asahi* for the exercise of personal jurisdiction over a foreign defendant, in keeping with traditional notions of fair play and substantial justice, were met in this case. It further asserts that the requirements for the exercise of personal jurisdiction over Campbell under the stream of commerce theory of minimum contacts espoused by Justice Brennan in *Asahi* were also met in this case. Finally, Aceto maintains that our supreme court's opinion in *Wiles v. Morita Iron Works Co.* (1988), 125 Ill. 2d 144, 530 N.E.2d 1382, does not compel a contrary conclusion.

In *Wiles*, our supreme court concluded that both of the stream of commerce theories of minimum contacts articulated in *Asahi* required the defendant's awareness that his product was being marketed in the forum State. Relying on the defendant's lack of awareness that the plaintiff's employer intended to transport to Illinois two of the four machines purchased from it in Japan or that the employer had a plant in Illinois, the *Wiles* court found that the defendant did not have the requisite minimum contacts with Illinois. (*Wiles*, 125 Ill. 2d at 160.) The *Wiles* court also stated that "[f]actors such as the plaintiff's interest in obtaining relief, the burden on the defendant in being forced to litigate in a foreign forum, and the forum State's interest in adjudicating the matter are generally addressed only after 'it has been decided that a defendant purposefully established minimum contacts with the forum State.'" (*Wiles*, 125 Ill. 2d at 161-62, quoting *Burger King Corp. v. Rudzewicz* (1985), 471 U.S. 462, 476, 85 L. Ed. 2d 528, 543, 105 S. Ct. 2174, 2184.) In other words, a court need not inquire whether the exercise of personal jurisdiction over a defendant would comport with traditional notions of fair play and substantial justice where the defendant has no minimum contacts with the forum.

Aceto asserts that, unlike the situation in *Wiles*, Campbell shipped its product to the United States, *i.e.*, introduced it into the stream of commerce, and was aware that Aceto would transport and distribute it through any number of States, including Illinois, to buyers of the product. Aceto reasons that, in using it as a distributor, Campbell was purposefully availing itself of Illinois in the process of marketing its product. Aceto notes the *Wiles* court's recognition of Justice O'Connor's reliance in *Asahi* on the fact that Asahi had not designed its

product with the California market in mind. In contrast, Aceto asserts, Campbell had to design its product, its container and labelling for all the United States, including Illinois, *i.e.*, for approval by the United States Environmental Protection Agency, regardless whether its product was being used in or merely transported through any State. Because Campbell must have known of the highly toxic nature of its product, EPA requirements to which it was subject and the use for its product throughout the United States, Aceto finally concludes, it had sufficient minimum contacts with Illinois for the exercise of jurisdiction over it.

On the other hand, Campbell asserts that under *Wiles* we must determine first whether it had sufficient minimum contacts with Illinois and, only if it did, then determine whether an exercise of personal jurisdiction over it would offend traditional notions of fair play and substantial justice. Campbell asserts that under either Justice O'Connor's or Justice Brennan's interpretation of the stream of commerce theory of minimum contacts, it had insufficient contacts with Illinois.

Specifically, Campbell notes the following. It does no business and has no plants or agents in Illinois. Its negotiations and other dealings with Aceto took place either at Aceto's headquarters in Flushing, New York, or Campbell's headquarters in Manchester, England. Moreover, it notes that in *Wiles* the American buyer of the product at issue delivered it to and used it in Illinois and there was evidence that the Japanese defendant had knowledge of the buyer's intent to do so. It asserts that here, in contrast, its product was intended for delivery to and use in Iowa, not Illinois, and that Campbell was not aware that its product would be marketed in, or even pass through, Illinois. Given the Japanese defendant's knowledge in *Wiles* of the buyer's intent to deliver its product to and use it in Illinois, Campbell argues, similar knowledge on its part of Aceto's plans for the Phorate would be insufficient to establish minimum contacts with Illinois.

Even assuming that Campbell did have sufficient minimum contacts with Illinois under either Justice O'Connor's or Justice Brennan's interpretation of the stream of commerce theory, Campbell argues, the exercise of jurisdiction over it would offend traditional notions of fair play and substantial justice. Campbell lastly asserts that, contrary to Aceto's assertion, the fact that Phorate is a highly toxic substance has no bearing on the determination whether Illinois may exercise personal jurisdiction over it. Campbell likens Aceto's argument to, *inter alia*, the "dangerous instrumentality" theory rejected in *World-Wide Volkswagen Corp. v. Woodson* (1980), 444 U.S.

286, 62 L. Ed. 2d 490, 100 S. Ct. 559.

As will be made clear below, we reject Campbell's stream of commerce analysis and its argument that the toxic nature of its product is irrelevant to the issue here. However, we agree with it that Illinois cannot exercise jurisdiction over it in keeping with traditional notions of fair play and substantial justice.

Notwithstanding the parties' chief reliance on *Asahi* and *Wiles*, we do not believe they control the first determination we must make, *i.e.*, whether Campbell had sufficient minimum contacts with Illinois to allow it to exercise *in personam* jurisdiction over Campbell. Rather, we believe that determination is governed by the analysis undertaken in a line of Federal court cases dealing with hazardous and/or toxic products represented by *Violet v. Picillo* (D.R.I. 1985), 613 F. Supp. 1563, and including *Allied Towing Corp. v. Great Eastern Petroleum Corp.* (E.D. Va. 1986), 642 F. Supp. 1339, cited by Aceto.

In *Allied Towing*, the issue was whether Virginia could exercise personal jurisdiction over a Pennsylvania public utility (PGW) which did no business, either directly or indirectly, in Virginia. PGW had sold a by-product of an oil-to-natural gas manufacturing process to Sealand, which intended to use the by-product to make roofing materials. Sealand had the by-product stored in a Pennsylvania facility. The storage concern eventually sold the by-product to the Great Eastern Petroleum Corporation which, in turn, sold it to Allied Petroleum, Inc. Great Eastern contracted with plaintiff to transport the by-product from Pennsylvania to Virginia. Upon its arrival in Virginia, Allied Petroleum refused delivery. All prior owners of the by-product denied liability and refused to arrange for its removal. In articulating the parameters of the due process inquiry into whether PGW was amenable to suit in Virginia, the court did not draw a bright line between its minimum contacts inquiry and its fair play/substantial justice inquiry. Rather, the court noted:

> "The 'minimum contacts' analysis of [*International Shoe v. Washington* (1945), 326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95] is based on 'traditional notions of fair play and substantial justice.' [Citation.] Determining what constitutes fair play and substantial justice requires a delicate balancing of the interests of all those involved ***. While the burden that inconvenient litigation places on the defendant is always a primary concern [citation], the Court must also consider 'the forum State's interest in adjudicating the dispute, ... the plaintiff's interest in obtaining convenient and effective relief ... the interstate judicial system's interest in obtaining the most efficient resolution of con-

troversies; and the shared interest of the several States in furthering fundamental substantive social policies.' " [Citation.] *Allied Towing*, 642 F. Supp. at 1354-55.

The court further stated:

"PGW's sole contact with Virginia was the series of events by which the \*\*\* by-product \*\*\* made its way to Virginia. [Citation.] The minimum contacts analysis mandated by the due process clause is not merely a quantitative inquiry, however. In determining whether the defendant's contacts with the forum are such that the defendant should reasonably anticipate being haled into the courts of that forum, the courts consider the nature or quality of the contacts as well as their number. [Citations.] \*\*\*

When the nonresident defendant places an inherently dangerous substance, such as the hazardous waste at issue here, into the stream of commerce, there is a substantial likelihood that the defendant will be called upon to defend in the state whose citizens have been injured or endangered by that instrumentality. Thus, 'the nature of the product may well have a bearing upon the issue of minimum contact, with a lesser volume of inherently dangerous products constituting a more significant contact with the state than would a larger volume of products offering little or no hazard to the inhabitants of the state.' [Citations.] \*\*\*

\*\*\* PGW sold this substance \*\*\* with the knowledge and expectation that it would be further distributed in the stream of interstate commerce. \*\*\* It is immaterial that PGW itself did not sell the substance to a Virginia purchaser or deliver it to Virginia. It is sufficient that PGW placed the substance into the stream of commerce, enabling the waste to pose a threat to the citizens of any state in which it might come to rest. \*\*\* The placement of an article, particularly a hazardous one, in the stream of interstate commerce, makes it foreseeable that one will be called upon to defend in the courts of a state with which one would otherwise have had no direct contact \*\*\*. [Citation.]

Having placed the substance in the stream of commerce, by selling it to an out-of-state manufacturer, PGW took no affirmative step to \*\*\* limit its exposure to suit in foreign jurisdictions. [Citation.] This might have been accomplished, for example, by restricting Sealand's use of the product or by specifying \*\*\* a limited geographic market for Sealand's final product.

[Citation.] PGW's failure to exercise any control over the destination of the substance *** made it possible for that substance to come to rest in any state." *Allied Towing*, 642 F. Supp. at 1355-56.

In the final portion of its analysis, the court measured the burden foreign litigation would place on PGW against the reduced minimum contacts standards applicable to the case. It concluded that "[g]iven the *** weighty considerations militating in favor of a single proceeding ***, particularly the alleged hazard facing the residents of [the] area, and the minimal burden imposed on PGW by requiring it to defend *** [in] Virginia, *** it [is] both fair and reasonable to subject PGW to the court's personal jurisdiction." *Allied Towing*, 642 F. Supp. at 1357.

The analysis undertaken by the *Allied Towing* court is substantially unaffected by *Asahi*. In *O'Neill v. Picillo* (D.R.I. 1988), 682 F. Supp. 706, the same case as *Violet*, the State of Rhode Island sought recovery of the cost of cleaning up a hazardous waste site. The motion of two defendants, to whom the plaintiff had traced 36 fifty-five gallon drums at the site, to dismiss for lack of personal jurisdiction had been denied in *Violet*, *i.e.*, before *Asahi*. One of those defendants renewed its motion post-trial. The court reconsidered its prior ruling in light of *Asahi*. The *O'Neill* court concluded:

"[T]he extra conduct seemingly required by [*Asahi*] *** is not necessarily required in cases of the kind presented here. It has long been acknowledged, and it was unanimously reaffirmed by *** *Asahi*, that 'the determination of the reasonableness of the exercise of jurisdiction in each case' will depend, not only on an evaluation of the defendant's connection with the forum state, but also on an evaluation of 'the interests of the forum state, and the plaintiff's interest in obtaining relief.' [Citation.] *** [I]t has generally been recognized[ ] that the nature and significance of [a] state's interest may have a bearing on the nature and extent of the necessary contacts." *O'Neill*, 682 F. Supp. at 717.

The court then repeated its findings in *Violet* that Rhode Island had compelling interests in the litigation, including a significant interest in redressing injuries occurring within its borders. *O'Neill*, 682 F. Supp. at 717-18.

■ This case involves the ultimate liability for injuries to an Illinois plaintiff allegedly caused by a chemical used in the manufacture of insecticides. Campbell admitted the use to which Phorate is put in its reply memorandum in support of its motion to dismiss. This is a

judicial admission which is binding upon Campbell. (*Trapkus v. Edstrom's, Inc.* (1986), 140 Ill. App. 3d 720, 489 N.E.2d 340.) In view of that fact and Aceto's allegation in its amended third-party complaint that the Phorate is highly toxic, we believe that the analysis undertaken in *Violet, Allied Towing* and *O'Neill* applies to this case.

■ Like the States in *Violet, O'Neill,* and *Allied Towing,* Illinois has an undeniable and manifest interest in protecting the health and welfare of its citizens from hazardous substances such as the Phorate involved here. Illustrative of this interest are the Uniform Hazardous Substances Act of Illinois (Ill. Rev. Stat. 1987, ch. 111½, par. 251 *et seq.*) and the Illinois Pesticide Act (Ill. Rev. Stat. 1987, ch. 5, par. 801 *et seq.*). Like those States, it also has an interest in redressing injuries occurring within its borders in its courts.

Moreover, a broadened scope of foreseeability of harm must be ascribed to Campbell in manufacturing and selling a toxic substance such as Phorate. See *Violet v. Picillo* (D.R.I. 1985), 613 F. Supp. 1563, 1577 (defendants knew or should have known that they were dispatching hazardous chemical wastes into a stream of commerce broad enough to include any or all States).

In addition, Campbell, like the defendants in *Allied Towing* and *Violet,* took no affirmative steps to limit its exposure to suit in foreign jurisdictions by, for instance, limiting the number of States in which Aceto could market the Phorate or, more importantly in this case, the number of States through which Aceto could transport it.

In view of the foregoing, we believe that Campbell's act of selling Phorate Technical to an American company, which created a possibility that the Phorate might cause injury in any State, including Illinois, when coupled with the fact that such injury did allegedly occur in Illinois, constitutes sufficient minimum contacts with Illinois to allow it to exercise personal jurisdiction over Campbell.

■ Moreover, we do not believe that *World-Wide Volkswagen v. Woodson* (1980), 444 U.S. 286, 62 L. Ed. 2d 490, 100 S. Ct. 559, requires a contrary conclusion. In *Woodson,* the plaintiffs, who had purchased an automobile in the State of New York while they resided there, were involved in an accident in Oklahoma. They brought suit in an Oklahoma State court against, among others, the automobile's regional distributor and its retailer seller. Neither the regional distributor nor retail seller did any business in Oklahoma, shipped or sold any products to or in that State, had an agent to receive process or advertised there. There was also no showing that any other product sold by the defendants had ever entered Oklahoma.

The Supreme Court barred the exercise of jurisdiction over the

defendants by the Oklahoma courts. In so doing, it rejected the plaintiffs' reliance on the foreseeability that the defendants' product would cause injury in Oklahoma. The court stated that, although it was foreseeable that purchasers of defendants' automobiles might take them to Oklahoma, "the mere 'unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.' " (*Woodson*, 444 U.S. at 298, 62 L. Ed. 2d at 502, 100 S. Ct. at 567, citing *Hanson v. Denckla* (1958), 357 U.S. 235, 253, 2 L. Ed. 2d 1283, 1298, 78 S. Ct. 1228, 1239-40.) The court also noted that, if foreseeability were the lone benchmark for personal jurisdiction, under the due process clause, every seller of chattels would, in effect, appoint the chattel as his agent for service of process, *i.e.*, his amenability to suit would travel with the chattel. Rather than a foreseeability of a "likelihood that a product will find its way into a forum State," the foreseeability which was important to a due process analysis was that the defendant's conduct and connection with the forum State were such that he should reasonably anticipate being haled into court there. Finally, the court rejected the characterization of an automobile as a dangerous instrumentality as a basis for exercising jurisdiction over the defendants by holding that the concept had no bearing on the issue of jurisdiction. *Woodson*, 444 U.S. at 295-97, 62 L. Ed. 2d at 500-01, 100 S. Ct. at 566-67.

Although a seemingly insuperable obstacle to the *Violet* line of cases and thus our conclusion here, *Woodson* has not been treated as such by Federal district and appellate courts.

*Woodson* itself makes clear that jurisdiction may be asserted over the international and national distributors of a product, as opposed to its local sellers, if a sale of the product was not merely "an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in" the forum State. (*Woodson*, 444 U.S. at 297-98, 62 L. Ed. 2d at 501-02, 100 S. Ct. at 567; *Violet v. Picillo* (D.R.I. 1985), 613 F. Supp. 1563, 1575-76.) Furthermore, as the *Violet* court stated in finding that *Woodson* supported the exercise of jurisdiction over the defendants in that case:

> "[T]he key factors justifying a different jurisdictional rule are two-fold.
>
> First, unlike local merchants, such interstate distributors have an 'interest in reaching as broad a market as' possible [citation], and place their products into the stream of commerce with either the subjective intention [citation], or objective rea-

son to know [citation], that their products will be sold 'to a nation-wide market, that is, in any or all states' [citation]. Thus, even if their 'products were sold indirectly through importers or distributors with independent sales and marketing schemes' [citation] ***—independent parties whom the defendant distributors do not directly control [citation]—and even if their products are sold to an intermediary with ' "no indication whatsoever as to their ultimate destination" ' [citation], the fact that these manufacturers or distributors place their products in a stream of commerce destined for sale through a broad interstate market, and reap the attendant benefits, renders them properly subject to suit in one of the states comprising that market.

The second important distinguishing factor is that, unlike local merchants serving a self-circumscribed market, who 'ordinarily [have] no control over where the buyer takes the product after it is sold' [citation], parties operating on a broad interstate scale can act 'to limit the states in which [their products will] be sold' [citation], and can thereby protect themselves against suit in an undesired forum." *Violet*, 613 F. Supp. at 1576.

In view of the factors the *Violet* court found supporting a different rule of jurisdiction as to interstate manufacturers and distributors of a product, as opposed to its local sellers, we do not believe that *Woodson* prohibits the exercise of jurisdiction by Illinois over Campbell.

Implicitly addressing the *Woodson* court's rejection of the dangerous instrumentality concept as a ground for exercising personal jurisdiction over a manufacturer or distributor, *Violet* further stated:

"[T]his is not a situation in which the product placed in the stream of commerce is an ordinary one. Rather, these defendants dispatched into that stream volatile and dangerous toxic substances—and did so without determining where these substances would come to rest. As other courts have recognized, and as common sense suggests, where a defendant deals in such inherently dangerous products, a lesser showing than is ordinarily required will support jurisdiction. [Citations.] This is especially so where, as here, the defendants engaged in heavily regulated activities, such that it is reasonable for them to foresee, given their chosen course of conduct, having to litigate in a distant forum." *Violet*, 613 F. Supp. at 1577-78.

Citing *Woodson* and a Fourth Circuit case, the defendant in *Allied*

*Towing* contended that the expectation that its product might come to rest in any State as a result of its failure to exercise any control over its destination was an insufficient basis for exercising jurisdiction over it. The court rejected this argument by stating:

> "Neither case, however, involved an inherently dangerous instrumentality. When an inherently dangerous instrumentality is released in commerce, and *** causes tortious injury in a foreign forum, the threshold for establishing jurisdiction is less demanding. [Citations.] Similarly, the scope of 'foreseeability' broadens when the enterprise giving rise to the action is subject to pervasive federal regulation." *Allied Towing Corp. v. Great Eastern Petroleum Corp.* (E.D. Va. 1986), 642 F. Supp. 1339, 1356-57.

In *O'Neill*, the court found that Rhode Island's interests in adjudicating the suit were enhanced by the fact that the case involved inherently dangerous toxic substances rather than ordinary products. In support, the court, like plaintiff here, cited, *inter alia*, Justice Stevens' observation in *Asahi* that the determination whether a defendant has purposefully availed himself of a forum State's market is affected by the volume, value and hazardous character of its product. (*Asahi Metal Industry Co. v. Superior Court* (1987), 480 U.S. 102, 122, 94 L. Ed. 2d 92, 111, 107 S. Ct. 1026, 1038 (Stevens, J., concurring, joined by White and Blackmun, JJ.).) The court lastly held, *inter alia*, that the fact the defendants operated in a nationally regulated industry also increased the significance of the contact with the forum. *O'Neill v. Picillo* (D.R.I. 1988), 682 F. Supp. 706, 718.

Similarly, in *Morris v. SSE, Inc.* (11th Cir. 1988), 843 F.2d 489, the court, relying upon Justice Stevens' reference in *Asahi* to hazardous products, allowed the exercise of jurisdiction over the defendant based, in part, on the fact that the case involved a highly hazardous product, *i.e.*, a device used in the hazardous activity of skydiving. See also *Poyner v. Erma Werke GMBH* (6th Cir. 1980), 618 F.2d 1186, 1192 (injuries caused by inherently dangerous articles imported through independent distributors fall within class of litigation which a forum State has a deep interest in adjudicating); *Chattanooga Corp. v. Klingler* (E.D. Tenn. 1981), 528 F. Supp. 372, 378 (requisite contacts might be minimized if the plaintiff's claim involves the placing of a dangerous instrumentality in commerce), *rev'd on other grounds* (6th Cir. 1983), 704 F.2d 903.

These cases thus reveal that, notwithstanding the *dictum* in *Woodson* that the dangerous instrumentality concept is irrelevant to the issue of jurisdiction, the courts still consider the dangerousness or

hazardous nature of a product in determining the issue of jurisdiction. The continuing validity of these cases and Justice Stevens' reliance in *Asahi* on the hazardous nature of a product cast doubt upon the weight to be given the rejection of the dangerous instrumentality concept in a footnote in *Woodson*. (But see *Bodine's Inc. v. Sunny-O, Inc.* (N.D. Ill. 1980), 494 F. Supp. 1279, 1284 (stating that *Woodson* expressly rejected the proposition that different rules of jurisdiction obtain in cases involving dangerous products).) Because this case is more analogous to the *Violet-Allied Towing-O'Neill* line of cases than to *Woodson*, we do not find that *Woodson* requires us to reject the dangerous instrumentality concept as a factor in the minimum contacts determination.

■ Moreover, we believe that the requirement that the product be placed in the stream of commerce of the forum State is also satisfied in this case. We concede that the Phorate was not placed in the "stream of commerce" of Illinois as that phrase is traditionally used in cases such as this. That is, it was not destined for sale to Illinois consumers. (See *World-Wide Volkswagen v. Woodson* (1980), 444 U.S. 286, 297-98, 62 L. Ed. 2d 490, 501-02, 100 S. Ct. 559, 567-68; *Asahi Metal Industry Co. v. Superior Court* (1987), 480 U.S. 102, 120, 94 L. Ed. 2d 92, 109-10, 107 S. Ct. 1026, 1037 (opinion of Brennan, J., joined by White, Marshall and Blackmun, JJ.).) However, just as the hazardous waste products dumped in Rhode Island in *Violet* and *O'Neill* were considered in the stream of commerce of that State, we believe that the Phorate involved here was sufficiently within the stream of commerce of Illinois, although not destined for sale or consumption here.

In *Violet*, the court stated that, when viewed in the context of a hazardous waste disposal industry permeated by national problems of improper dumping, "each defendant's decision to send its toxic wastes on a virtual one-way journey to anywhere [represented] a decision to avail itself of the benefits of a potentially boundless national disposal market." (*Violet v. Picillo* (D.R.I. 1985), 613 F. Supp. 1563, 1577.) Similarly here, when viewed in the context of a nationwide hazardous products industry and the use which that industry, like many industries, makes of the interstate transportation system, as revealed in this case, Campbell's decision to sell Phorate to an American company constituted a decision to avail itself of a potentially boundless national market for its product. As such, the decision of Aceto's agent to transport the Phorate manufactured by Campbell through Illinois on its way to Iowa created a sufficient contact between Campbell and Illinois to allow the State to exercise jurisdiction over Campbell. The

fact that Aceto, not Campbell, caused the Phorate which injured the plaintiff to be brought into Illinois does not, under *Allied Towing*, prevent the exercise of jurisdiction over Campbell by Illinois.

■ Having determined that Campbell has sufficient minimum contacts with Illinois to allow Illinois to exercise personal jurisdiction over it, we must make the second determination in the due process analysis of *Allied Towing, Violet* and *O'Neill*, as affected by *Asahi*. That is, we must determine whether Illinois can exercise personal jurisdiction over Campbell which comports with traditional notions of fair play and substantial justice. To do so, we must consider the burden on Campbell, Illinois' interest in adjudicating the dispute, Aceto's interest in obtaining convenient and effective relief, the international judicial system's interest in the most efficient resolution of controversies and the procedural and substantive policies of other nations whose interests are affected by the exercise of jurisdiction by Illinois. *Asahi Metal Industry Co. v. Superior Court* (1987), 480 U.S. 102, 114, 94 L. Ed. 2d 92, 105-06, 107 S. Ct. 1026, 1033-34.

Subjecting Campbell to the personal jurisdiction of Illinois would impose upon it the severe burden of traversing the vast distance between England and Illinois and subjecting its dispute with Aceto to a foreign nation's judicial system. This unique burden has "significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." (*Asahi*, 480 U.S. at 114, 94 L. Ed. 2d at 105, 107 S. Ct. at 1034.) Moreover, we do not agree with Aceto's bald assertion that our judicial system is "not really" foreign to Campbell. Whether based on the common language of England and the United States or the common law heritage of both countries, we find the assertion meritless.

Unlike the situation in *Asahi*, and as reflected in our minimum contacts determination, Illinois has more than a slight interest in asserting jurisdiction over Campbell, given the context of this case. On balance, however, that interest and Aceto's interests do not outweigh the burden upon Campbell.

Unlike the situation in *Asahi*, the main plaintiff's claim is still pending here; however, this case, like *Asahi*, does not involve a dispute over safety standards, in which Illinois has a legitimate interest, but merely a third-party dispute over liability to the main plaintiff. Moreover, as in *Asahi*, it is, at best, uncertain whether Illinois law will govern Campbell's liability for contribution to Aceto, *i.e.*, whether the most significant contacts test calls for application of Illinois law to Aceto's contribution claim. (See *Mech v. Pullman Standard* (1985), 136 Ill. App. 3d 939, 484 N.E.2d 776.) Illinois, like the States in *Violet*,

*O'Neill* and *Allied Towing*, has an interest in adjudicating all claims arising from plaintiff's injuries in one proceeding. This interest militates in favor of exercising its jurisdiction over Campbell.

As in *Asahi*, however, no part of the transaction upon which Aceto bases its claim took place in Illinois. Unlike the *Asahi* situation, Campbell shipped its products to the United States. Also unlike *Asahi*, we believe that Aceto, an American company, is entitled to a presumption that it would be more convenient for it to litigate its claim in Illinois rather than England. However, we must conclude from Aceto's failure to allege the contrary in its third-party complaint that it is not a citizen of Illinois. This fact considerably diminishes Illinois' interests in this dispute. (*Asahi*, 480 U.S. at 105, 94 L. Ed. 2d at 106, 107 S. Ct. at 1034.) Finally, we may assume that, if subjected to liability in Illinois, Aceto will, as a purchaser of Campbell's products, pressure Campbell to cease unsafe practices in the manufacture, containment and labelling of those products. These pressures will have a similar effect to the deterrence to such practices which would result from requiring Campbell to defend itself in Illinois against allegations of unsafe practices in the manufacture, containment and labelling of its product. See *Asahi*, 480 U.S. at 115, 94 L. Ed. 2d at 106, 107 S. Ct. at 1034.

Finally, whatever the procedural and substantive interests of Great Britain in Illinois' exercise of jurisdiction over Campbell, those interests and the Federal government's interests in its foreign relations require us to exercise "[g]reat care and reserve" in extending personal jurisdiction over Campbell. (*Asahi*, 480 U.S. at 115, 94 L. Ed. 2d at 106, 107 S. Ct. at 1034-35.) As such, we cannot conclude that the interests of Illinois in exercising jurisdiction in this case, albeit greater than the similar interests of California in *Asahi*, are sufficient to outweigh the serious burdens that we would place upon Campbell. In sum, the exercise by Illinois of *in personam* jurisdiction over Campbell would not comport with traditional notions of fair play and substantial justice.

For all of the foregoing reasons, the order dismissing Aceto's amended third-party complaint for contribution from Campbell is affirmed.

Affirmed.

McNAMARA* and RIZZI, JJ., concur.

---

*Justice McNamara participated in this opinion prior to his assignment to the sixth division.